DETERMINED IN THE

## THIRD DISTRICT

OF THE

# APPELLATE COURT OF ILLINOIS

### DURING THE YEAR 1905.

---

## John H. Ware and Edward F. Leland, Copartners, etc., v. Arthur S. Dumont.

1. CRIMINAL CODE—*section 132 construed.* This section, which pertains to gambling, was intended to afford a remedy by way of restitution, enabling the person losing to recover back the money or other valuable thing lost, and the loser is the person to whom such money or other valuable thing belongs.

2. GAMBLING—*what essential to establishment of transactions in grain as.* Where money lost in dealing in grain upon a board of trade is sought to be recovered as gambling losses, it is essential that it appear that the defendant, as well as the plaintiff, intended that the grain bought and sold should not be received or delivered and that settlements should be made upon the differences merely.

Bill in equity under section 132 of Criminal Code. Appeal from the Circuit Court of Macon County; the Hon. WILLIAM C. JOHNS, Judge, presiding. Heard in this court at the November term, 1904. Reversed and remanded. Opinion filed June 7, 1905. Rehearing denied November 22, 1905.

HERRICK, ALLEN, BOYESEN & MARTIN, for appellants.

LEFORGEE & VAIL, for appellee.

MR. PRESIDING JUSTICE BAUME delivered the opinion of the court.

This is a bill in equity by appellee against H. J. Houg-

(1)

land and George Kizer, doing business as H. J. Hougland & Co., the Decatur Commission Co., and the appellants, to recover money alleged by appellee to have been lost by him in gambling transactions in grain, on the Chicago Board of Trade. The bill alleges that appellee resides in Decatur and that appellants are commission men or brokers in grain and stocks, having offices in Chicago and that they are members of the Chicago Board of Trade; that the defendants Hougland and Kizer do business in Decatur, under the firm name of H. J. Hougland & Co., and the Decatur Commission Co.; that appellants are connected with and directly interested in the business transacted in the city of Decatur by said H. J. Hougland & Co., and the said Decatur Commission Co., and that all of the transactions therein set forth were with appellee as the party of the one part and all of the defendants of the second part, in conducting and transacting the business of appellee; that about June 28, 1900, appellee commenced dealing in options, by placing certain orders for the purchase and sale of options on grain, with H. J. Hougland & Co., in whose name the said business in Decatur said defendants then and there caused to be run and operated; that after June 28, 1900, appellee had a large number of transactions with the defendants and paid them large sums of money; and that in none of those transactions did appellee actually buy or sell any grain, but in every one of them "it was understood that neither the buyer or seller should receive or deliver the grain," and it was agreed "that the loss or gain, resulting from the transaction, should be settled by the payment and receipt of the difference between the price agreed upon and the market value of the grain upon the said Chicago Board of Trade at the time appointed for an alleged delivery or disposal of such option;" that certain of the transactions mentioned consisted in placing the orders with the defendants in Decatur, which were forwarded to the Chicago office of the appellants, Ware and Leland, and by them executed on the Chicago Board of Trade; that the only record of the transactions appellee has, is as follows:

September 5, 1900, sold to defendants 10,000 bu. November corn, 35⅞, 36c; September 13, 1900, sold 10,000 bu. November corn, 36⅛c; October 1, 1900, sold 10,000 bu. November corn, 37c; October 6, 1900, sold 10,000 bu. corn, 37⅜c, ½c; October 29, 1900, sold 10,000 bu. corn, at 36⅛c.

The bill further alleges that from September 5, 1900, to November 26th, appellee advanced and paid to the defendants in margins upon the said five sales of November corn the sum of $6,577.63, and that the said five transactions were not negotiated upon the Board of Trade nor in any other way, but that the said sum of money so advanced and paid by appellee was wholly lost. The prayer of the bill is that the transactions between appellee and the defendants be declared void; that an account be taken of the transactions and of the moneys paid by appellee to the defendants in regard to the same and that the defendants be decreed to pay to appellee what should be found due upon the accounting, and for such further relief as equity may require.

Appellants and the defendants Hougland and Kizer filed answers denying the material allegations of the bill, and upon replications being filed to such answers, the cause was referred to the master in chancery, "to take proofs and report his conclusions of law and fact and account." The master in chancery filed his report, finding in substance, that, as between appellee and Hougland and Kizer, the transactions involved were gambling transactions. The master, however, further found that the orders given by appellee to Hougland and Kizer were so given by appellee as the agent of, and on behalf of the firm of C. A. Burks & Co., of which firm appellee was a member, and not on his own personal account, and that, therefore, appellee could not sustain the bill; that in the transactions between Hougland and Kizer, acting for appellee, and appellants, no delivery of the commodity bought or sold was ever contemplated by Hougland and Kizer, but on the part of appellants it was contemplated that there would be a delivery unless the sale or purchase of a given commodity

was offset through the clearing house by a corresponding purchase or sale; that no such delivery was ever made in the transactions between Hougland and Kizer and appellants, except in one instance in which appellants as brokers for Hougland and Kizer had bought a quantity of oats, but failed to offset the purchase by a corresponding sale, but no such delivery of any commodity was made by appellants upon any order from Hougland and Kizer given in the execution of their orders from appellee; and that in transactions between Hougland and Kizer and appellants, appellants dealt with Hougland and Kizer as brokers and commission merchants for said Hougland and Kizer upon their employment, and not as partners or parties in interest in any of said transactions in any other manner whatsoever.

Appellants and appellee both filed objections to the master's report, which were overruled by the master and thereupon each of said parties filed their exceptions to said report. Upon the hearing before the chancellor on such exceptions, appellants asked leave to offer evidence that appellee had, since the commencement of this suit, proceeded in an action at law against Hougland and Kizer and obtained a judgment against them on account of the same transactions involved in this suit, and thereupon it was stipulated, subject to the objection of appellee, that such evidence was incompetent, immaterial and irrelevant, that on March 14, 1902, judgment was rendered, in a suit at law, in the Circuit Court of Macon County, in favor of appellee against H. J. Hougland and George Kizer for $8,012.36.

Appellee's exceptions to the master's report were sustained by the chancellor and a decree entered in favor of appellee against all of the defendants for $7,600. From this decree, the defendants John H. Ware and Edward F. Leland, copartners doing business as Ware & Leland, appeal to this court, and urge as grounds for reversal of the decree: first, that the right of action, if any, on which appellee relies is not vested in him, but in the firm of C. A. Burks & Co., and can only be enforced by that firm; second, that if it should be held that appellee has a right of action

in himself, the recovery must be against Hougland and Kizer and cannot be extended to appellants; third, because it includes a recovery for money alleged to have been paid by appellee to Hougland and Kizer on deals bucket-shopped by them, and as to which no orders were ever transmitted to appellants; fourth, that by electing to proceed at law against Hougland and Kizer, appellee waived his right to a decree in the case at bar against appellants.

The record in the case is voluminous, but the facts necessary to an understanding of the questions involved may be briefly stated, as follows: During the time covering the transactions in question appellants were members of the Chicago Board of Trade and commission men and brokers in grain and stocks, having offices and doing business in the city of Chicago, and appellee, a resident of Decatur, was a member of the firm of C. A. Burks & Co., engaged in the wholesale and commission grain business, buying grain from various elevator concerns throughout the state and distributing grain to the various stations and commission men throughout the country. Prior to April, 1900, H. J. Hougland and one Van Duyn, doing business in Decatur as the Decatur Commission Company, were engaged in taking orders from their customers for the purchase and sale of commodities on the Chicago Board of Trade, through appellants as their brokers. About April, 1900, Van Duyn retired from the business and George Kizer became associated with Hougland, under the firm name of H. J. Hougland & Co. The latter firm advertised appellants as their Chicago correspondents, and the arrangement between the two firms as to the conduct of the business was substantially as follows: that appellants should allow H. J. Hougland & Co. to use their private telegraph line for a rental of $41 per month; that a commission of one-eighth of a cent per bushel be charged their customers by H. J. Hougland & Co., and divided equally between appellants and Hougland & Co. Subsequently, owing to a rule of the Chicago Board of Trade prohibiting members from dividing commissions with non-members, the entire com-

mission of one-eighth of a cent per bushel was paid to ap-
pellants.  When a customer gave H. J. Hougland & Co. an
order to buy or sell any commodity, they ordinarily wired
the order to appellants and the latter would make the
transaction on the Chicago Board of Trade, and direct
Hougland & Co. to put up the margins necessary to protect
the trade.  Hougland & Co., having collected margins from
their customers, would, on receipt of a direction from ap-
pellants as to the amount of margins required, draw their
personal check therefor and deposit it to the credit of appel-
lants in the Citizens' National Bank of Decatur.

The transactions here involved were conducted by ap-
pellee in his own name, but it is clear from the evidence
that they were all undertaken on behalf of C. A. Burks &
Co., for the benefit of the firm in the conduct of its grain
business.  The money paid by appellee to Hougland & Co.
was realized upon checks signed C. A. Burks & Co., and
drawn upon the funds of C. A. Burks & Co. in the Citizens'
National Bank of Decatur; and the transactions were all
undertaken as a "hedge" against cash grain bought by the
firm of C. A. Burks & Co. in the country.  It also appears
from the evidence that in some of the transactions here
involved, the orders by appellee to H. J. Hougland & Co.
for the purchase or sale of grain were never sent by the
latter firm to appellants to be negotiated on the board of
trade, but were merely bucket-shopped by Hougland &.
Co., but the amount of money lost in the transactions thus
bucket-shopped does not appear.  It is conceded by ap-
pellants that in all of the transactions the understanding
between appellee and H. J. Hougland & Co. was that there
should be no delivery or acceptance of the grain bought
or sold, but that the transactions should be settled by the
payment of differences.  In other words, that the transac-
tions as between appellee and H. J. Hougland & Co. were
unlawful gambling transactions.

A right of recovery in this case is predicated upon sec-
tion 132 of the Criminal Code, which provides in part that
any person who shall, by gaming, lose and pay or deliver

to any person, any sum of money or other valuable thing, shall be at liberty to sue for and recover the money or other valuable thing so lost and paid or delivered, by action of debt, replevin, assumpsit or trover, or proceeding in chancery, from the winner thereof. It is clear to us that the provision of the statute referred to was intended as a remedy by way of restitution, enabling the person losing to recover back the money or other valuable thing lost, and that the loser must be held to be the person to whom the money or other valuable thing belongs. This view is abundantly sustained by the great weight of authority. Ruckman v. Pitcher, 20 N. Y. 9; Beard v. Snook, 47 Hun 158; Swaggerty v. Stokely, 1 Swan (Tenn.) 38; Wood v. Owens, 2 Swan (Tenn.) 146; Donahoe v. McDonald, 92 Ky. 123; Hornden v. Melby, 90 Mo. 5. As the money lost in the transactions involved in this case belonged indisputably to the firm of C. A. Burks & Co., the right of recovery therefor must be exercised and enforced by C. A. Burks & Co., and not by appellee. The conclusion at which we have arrived, respecting the right of appellee to maintain this suit, necessarily requires a reversal of the decree, and we might well waive the consideration and determination of other grounds urged by appellants for a reversal, but as the bill may be amended in that regard and the cause proceed to final decree based upon the same or substantially the same evidence, we are disposed now to state our views upon the other questions raised.

It is urged that there is no evidence in the record to support the allegation of the bill, that appellants "are connected with, and are directly interested in, the said business transacted in the city of Decatur by said H. J. Hougland & Co., and said Decatur Commission Co., and that all of the transactions hereinafter set forth, with complainant, were with complainant as the party of the one part and all of the defendants herein of the second part, in conducting and transacting said business of complainant," and that conceding a right of action in appellee, a recovery predicated upon the theory, that appellants knew of the gambling

intentions of appellee and H. J. Hougland & Co., cannot be supported by the allegation quoted. True, appellants could not, under the evidence, be held as partners in the strict legal sense, but we are not disposed to hold that the evidence fails to show that appellants were connected with and directly interested in the business carried on by H. J. Hougland & Co., within the commonly accepted meaning of those terms, so as to make them cognizant of the methods by which the transactions actually negotiated by them upon the board of trade, were conducted between H. J. Hougland & Co. and their customers. Appellants received a commission upon every order for the purchase or sale of commodities, sent them by H. J. Hougland & Co., and their relation as brokers for that firm was exclusive. Appellants furnished to Hougland & Co. the market quotations upon which the deals were made; they were financially interested in the volume of business sent them by Hougland & Co., to be transacted on the board of trade; they knew that Hougland & Co. held them out to the public as their exclusive correspondents; and they must be held to have known that the orders sent them by Hougland & Co. were solicited and received by the latter from customers who had paid the required margins to protect their deals. While the names of the individual customers, pretending to purchase or sell commodities, were not disclosed to appellants, and all the transactions were carried on their books "for account and risk of H. J. Hougland & Co.," appellants well knew that Hougland & Co. were merely middlemen in the transactions.

Before a recovery can be had against appellants for losses sustained in the transactions here involved, it must appear that they, as well as the losers, intended that the grain bought or sold should not be received or delivered, and that settlements should be made upon the differences merely. Such intention, however, on the part of appellants may be shown as well by all the attending circumstances of the transaction as by evidence of their assertions to that effect.

The record is replete with evidence that Hougland & Co., during the period covered by the transactions here involved, dealt with appellants in " puts " and " calls," and that the losses and gains were determined and adjusted by the differences in the market value of grain. These were gambling transactions, pure and simple (Pearce v. Foote, 113 Ill. 228), and appellants were knowingly parties thereto. While the fact that in the various deals negotiated by appellants, aggregating a large amount, there was a failure to deliver the grain sold or receive the grain bought, is not conclusive that the transactions were intended by appellants to be gambling transactions, it is an element proper to be taken into consideration with all the other evidence and circumstances in the case, in determining whether the business was conducted by appellants with such intention.

The transaction most suggestive of knowledge on the part of appellants, that the firm of C. A. Burks & Co., in their dealings through H. J. Hougland & Co., were engaged in gambling merely, occurred on November 26, 1900, and the method employed in conducting and consummating the deal then closed, is doubtless responsible for this litigation. The evidence shows that at various times from September 5 to October 29, 1900, C. A. Burks & Co. had given orders to sell in the aggregate 50,000 bushels of November corn, through H. J. Hougland & Co., who, with the evident purpose of bucket-shopping a portion of the deals, had not forwarded to appellants the orders to sell. On November 21, 1900, the corn market was advancing rapidly under the influence of the so-called " Phillips' corner," and H. J. Hougland & Co., requiring further margins, and not being able to communicate with appellee, gave appellants an order to sell 30,000 bushels November corn. Shortly thereafter appellee went to the office of Hougland & Co.; and, upon Hougland's request for more margins, gave a check for $2,500. Hougland did not inform appellee that he had purchased the 30,000 bushels, but upon receipt of the check covering further margins. decided to keep the purchase on his individual account.

The margins then paid were sufficient to protect the deals to 49½ cents per bushel. Thereafter appellee in view of the advancing market decided to close the deal and accept the present loss, and to that end sent his father W. L. Dumont to Chicago to interview appellants. Hougland & Co., claiming to have instructions from C. A. Burks to hold the deal open until the margins were exhausted, refused to permit the same to be closed, and appellants did not recognize W. L. Dumont as having authority to act in the matter. What took place in Chicago with reference to closing the deal through appellants on November 26th, is thus detailed by the witness H. J. Hougland: "When I arrived in Chicago and went to Ware & Leland's office on Monday morning the condition of this deal was that I only had sold there in the office about 15,000 bushels of corn of this 50,000. There was only about 15,000 of the 50,000 bushels that was in the hands of those people. I have a pretty good acquaintance with Mr. Ware. I told him I wanted to see him privately, and we went into his private office, and I told him the circumstances. I told him that Mr. Dumont at Decatur had sold 50,000 bushels of corn, and that I hadn't placed it at his figures; that they had delivered the corn one day before I placed it; then that I bought in 30,000 of it on Saturday, and we didn't want him to close the 50,000 bushels without it was all in Chicago; that I expected he had a big loss in it and he would want to see the papers and know just how it was closed out, and I wanted a little advice as to how to do it. I asked him if I could just buy in the 15,000 bushels that we still had, or how would be the better plan to do it. He said, ' If he thinks you have that much corn short here, and he has that much with you, you should buy and sell the 50,000 bushels on the market.' As quick as we could give these orders,— I also asked him about his advice in regard to the expense on this, one man wanting not to close it until the margin expired and another wanting to close it out, and he said, ' Call for margins and if they did not put it up, then take the liberty of closing it out yourself.' As to who con-

Ware v. Dumont.

ducted the entire transaction in Chicago upon that Monday morning it was all done through Ware & Leland and their employees. I acted upon that occasion upon Mr. Ware's advice. I saw W. L. Dumont upon that occasion up there. Mr. Dumont wanted to take the matter out of my hands and close the deal himself, but I declined to allow him to do it. I did communicate with Mr. Ware in relation to that matter. I think he told me to do just what I did. He said for me to call for margins, then close one deal out on the margin and buy and sell for that same amount. One of their employees went into the pit and bought and sold this amount of corn, 50,000 of November corn. The order was given and Mr. Ware gave it to the employee; I forget his name. It was after I had informed Mr. Ware that I sold out the 30,000 bushels upon Saturday before that and that there was only 15,000 of it still left over, that he gave the order. When I imparted this information to Mr. Ware upon that occasion, with reference to having sold out the 30,000, or bought in 30,000 upon that Saturday, he said I could just assume that amount myself. He said that I would have to in order to make my accounts show up right with Dumont. I would have to buy and sell the same amount that I didn't have at that time. I told him after I had bought the 30,000 bushels that Dumont had come into my office and paid me $2,500. I don't think I said anything to him upon that occasion with reference to where $1,500 or $2,000 of that money of Dumont's had gone. I told him his corn was margined to 49¼. So far as closing out the deal I was acting under his direction. When I determined to close this corn out, the 50,000 bushels, I waited till it reached 49½, for the simple reason that I had word from Mr. Burks not to close until the margin had expired; then when we got word that it was running over the margin I put the order in. When this 50,000 bushels of corn was bought up, as to the kind of a transaction that was, I don't know anything, except the order was given through a broker to buy 50,000 corn. I gave the order for that 50,000 bushels of corn. I sold it just as quick as we could sell it

after it was bought. My object in doing that was to show an account of purchase for this corn, with the view of causing Dumont to believe that his 50,000 bushels of corn had been actually negotiated that morning at 49½ cents on the Board of Trade. Mr. Ware advised me to do that. I was not contemplating any sort of delivery at the time of taking that corn when I bought 50,000 bushels there. I sold it out at a loss."

It is clear that, as to this transaction, appellants had actual notice that C. A. Burks & Co. were the parties concerned, and that it was advised and negotiated by appellants, in connection with Hougland & Co., without any intention to receive or deliver the 50,000 bushels of November corn, then bought and sold.

The decree in this case included all the money appellee had paid to H. J. Hougland & Co., as margins, on all the transactions he had with them. As to some of these transactions, the evidence shows that no orders were sent to appellants by Hougland & Co., and that they were bucket-shopped by the latter firm. Appellants had no connection whatever with the transactions so bucket-shopped by Hougland & Co., and the losers therein have no right to recover therefor against them.

Holding, as we do, that the firm of C. A. Burks & Co. were the losers in the transactions properly involved and that appellee has no individual right of action against appellants, the question as to the effect, as an election or waiver, of the judgment at law, recovered by appellee against H. J. Hougland & Co., becomes irrelevant and immaterial, and need not be considered.

For the reasons stated, the decree is reversed and the cause remanded, for such further proceedings upon proper pleadings as the parties may elect, not inconsistent with the views here expressed.

*Reversed and remanded.*