## LITTLETON T. DRYDEN, ADMINISTRATOR, *vs.* ZELL & MERCERET.

*Wagering Contract—Burden of Proof—Purchase of Shares of Stock on Margin—Evidence.*

In an action by a broker to recover the amount due by a customer for shares of stock bought by the latter on margin, the burden of proof is upon the defendant to show that the transaction between the parties was a gaming or wagering contract and not an actual sale.

The evidence in this case examined and held to show that the transaction between the plaintiffs, stock brokers, and the defendant, a customer, was a *bona fide* sale of shares of stock and not a mere wager on the difference between the prices of the stock on different days.

When a broker buys shares of stock for a customer who deposits with him a margin in part payment, there is no obligation upon the broker to sell such stock before being requested so to do or before the agreement between the parties requires a sale. Consequently in an action by the broker to recover the balance of the purchase price questions as to the market value of the shares at other times are irrelevant.

*Decided November 16th, 1906.*

Appeal from the Baltimore City Court (WRIGHT, J.)

The cause was argued before McSHERRY, C. J., BRISCOE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*Thos. Ireland Elliott*, for the appellant.

*Frank Gosnell* (with whom was *James W. McElroy* on the brief), for the appellees.

BURKE, J., delivered the opinion of the Court.

This appeal presents an inquiry into a certain stock transaction had by Samuel I. Ford, now deceased, acting through his agent, A. Lincoln Dryden, with the firm of Zell & Merceret, who were licensed stock brokers of Baltimore City and members of the Stock Exchange. Samuel I. Ford, died in 1904, and this suit was brought against his administrator, Littleton T. Dryden, and resulted in a judgment against him in the Baltimore City Court for the sum of $1,414.37 to bind assets in his hands. From that judgment this appeal was taken.

The record brings up for review three questions only—two of which relate to the ruling of the Court upon questions of evidence, and one to the action of the Court in dealing with the special exceptions filed by the plaintiff to the defendant's prayers, and in refusing the two prayers offered by the defendant. The account upon which this suit was instituted was opened by the defendant's intestate with the plaintiffs on the 10th of April, 1901, but the evidence shows that there had been prior stock transactions between the parties. The accounts as to these, however, had been closed on the 4th of April, 1901, by a check given by the firm to Samuel I. Ford for the amount due him, towit, the sum of $1,145. A new account was opened on the 10th of April, 1901, on which day the plaintiffs contend that Samuel I. Ford purchased from them through his agent, A. Lincoln Dryden, twenty shares of stock of the International Trust Company, and twenty-five shares of Continental Trust Company Stock. At the close of plaintiff's case, it was agreed by counsel that if the jury should find a verdict for the plaintiffs it should be for the purchase price of twenty-five shares of Continental Trust Company stock at $241.25 per share, equalling $6,056.38, which, with interest at six per cent added, less dividends received with interest thereon at six per cent, amounted to the sum of $6,413.37; and that there should be deducted from the last mentioned amount, the value of the twenty-five shares of Continental Trust Company stock at the present market price of $200 per share; namely, $5,000; the

plaintiffs to retain said sum; and that the verdict and judgment in the case, if for the plaintiffs, were only to bind the assets.   The jury found for the plaintiffs and the amount of their verdict was in exact accordance with the agreement.  We are, therefore, relieved of any question as to the proper measure of damages, as that was agreed upon by the parties themselves, and was followed by the jury in fixing the amount of the verdict.

The appeal involves a consideration of the real nature of the transaction between the parties as to the twenty-five shares of Continental Trust Company stock mentioned in the agreement of counsel referred to above.   The claim of the plaintiffs is that there had been a *bona fide* purchase from them by Samuel I. Ford of said stock, and that in consequence of the depreciation in the market value of the stock he had become indebted to them in a sum equal to that found by the verdict of the jury; the contention of the defendant is, that the transaction was a gaming, or wagering contract, as those terms have been defined by this Court in the cases of *Burt* v. *Myer*, 71 Md. 502–4; *Billingslea* v. *Smith*, 77 Md. 519; *Cover* v. *Smith*, 82 Md. 593, and is, therefore, null and void.   What is a gambling or wagering contract, as applied to cases of this kind upon which no recovery can be had in this State, is thus defined in *Billingslea* v. *Smith, supra;* "Where the contract is that in case of a decline in the market price of the stock the purchaser is to pay the difference between the contract price and the market price, and there is no intention that he shall receive and pay for the stock itself, the dealing is a gambling contract, and the law does not permit an action to be maintained upon it."

The law presumes the validity of the contract sued on and the burden is upon the defendant to offer evidence legally sufficient to prove that it was a gambling contract within the rules stated.   Is there any evidence in the case legally sufficient to support the defendant's contention?   The circumstances under which the dealings between the parties began, as testified to by Mr. A. Lincoln Dryden, will shed a great deal of light

upon the intention of the parties and upon the real nature of the transaction. Mr. Dryden testified that while on a visit to Buffalo he had met his uncle, Mr. Ford, who spoke to him about some friends in Baltimore whom he had heard were dealing in securities, and that he requested witness to take a few hundred dollars, and "see what you can do with it for me;" that upon his return to Baltimore he saw Mr. Merceret at the Custom House, and told him of his uncle's request: "I told him just what had happened, and I said I have just so much money here. What do you think is the best thing to do? *I would like to purchase.* He said, I will go back and let you know. I do not think he had anything that day, but I am not sure. He went ahead to make some *purchases* that day, and I gave him the margin on whatever he *purchased.*" In the two accounts, the first of which was opened December 3rd, 1900, and closed on the 4th of April, 1901, it appears that all the shares of stock therein mentioned were actually bought and paid for in cash by Zell & Merceret, and that they carried the securities so purchased for the account of Samuel I. Ford, charging him interest and taxes, and crediting him with the dividends and part payments, and that they were ready to deliver the securities to him at any time upon his payment of the sum due on the purchase. Mr. Zell testified that his firm was prepared to deliver the certificates of stock to Mr. Ford. "We paid for them, and if he had paid us, we would have delivered the certificates; we were in a position to deliver them."

The method of dealing when the purchase is made upon marginal accounts, is stated as follows by Mr. Zell: "A Juror: When stock is bought on margin, does the customer get a certificate of that stock? A. If the stock is bought for cash; if you should buy a hundred shares of Consolidated Gas at $90 a share that would represent $9,000.00, and if you gave me a check for $9,000.00, I should deliver the hundred shares of gas stock less the commission, but if you bought gas stock on a margin I would require you to put up a thousand dollars. Q. Then I would not get the certificate? A.

I would get the certificate and after that borrow on the certificate from the Bank or Trust Company. Mr. Gosnell: The certificate would not be given up until all was paid? A. Not until everything was paid; we never give it up until then; everything has to be paid in full; we do not give the certificates, except then; we could not allow a customer simply to put up a margin and give him the certificate, it would be impossible to do that. Mr. Gosnell: In other words, in reference to the former question, it was a proper thing for you to hold the twenty-five shares until the account was paid for? A. Until it was paid for, by a margin people not having the full amount of money to pay for the stock can secure it; say stock is worth $5,000.00 and they come in here and put a thousand dollars margin, and I have had lots of people come in six weeks afterwards and pay the difference of $4,000.00, and take that stock up; some people never take it up.' Q. You paid for it in 1901? A. I paid for it; we don't buy anything on the Exchange you don't pay spot cash for; it is all cash business, all our dealings on the Exchange. "

There can be no doubt that Mr. A. Lincoln Dryden contracted to buy from the plaintiffs for account of his uncle the Continental stock, and that the stock was purchased by them in pursuance of his direction. It was so testified to by Mr. Zell, and not denied by Mr. Dryden. It is also clear that Mr. Ford had knowledge of the purchase and that he ratified and acquiesced in the purchase of that stock. Upon this point Mr. Dryden testified as follows: "Q. Will you tell us what, if anything, your uncle did after he was informed of the purchase of twenty-five shares of Continental toward giving his consent to the purchase or acceptance of the purchase? A. He was afraid; as the darky says, kind of skittish. He was a lecturer and what money he made he kept in bank. He was always more or less timid and when he found that another move had been made he was a little timid about the matter, and said, 'I do not know whether this is best or not. I do not think you ought to have done it, perhaps. He demurred but he said, All right let it go, four hundred will make it even."

The Court: Then he acceded to the purchase?  A. With some hesitancy and with some little regret, may be, that it had been done.   Anyway he stood by the four hundred, and that I did not see him any more until Mr. Merceret said Mr. Zell was pressing him very strenously, and unless something was done he was going to sell out."

We fail to find any evidence legally sufficient to bring the case within the principle of the cases referred to above, and, therefore, the Court was right in its rulings upon the special exceptions to the defendant's first and second prayers, and in refusing to grant those prayers.   The first and second exceptions were taken to the refusal of the Court to permit the defendants to ask the witness, Edwin S. Zell the following questions:   1st, "That leads me to ask this question; if you had sold the Continental Trust Company stock when you sold the International Trust Company stock, or if you had sold the Continental Trust stock when the margin was exhausted would you not have gotten more money for it than you would have today?"   2nd, "Do you know what the Continental Trust Company stock was selling for on the 22nd day of November, 1901, the date of this letter?"  As to these exceptions it is sufficient to say that there was no obligation upon the plaintiffs to have sold the stock at the time indicated in the questions, and besides they had been expressly requested not to sell the Continental Trust Company stock.  We think the objections to these questions were properly sustained.

*Judgment affirmed with costs to the appellees above and below.*