BRUNO RICHTER ᴇᴛ ᴀʟ. *vs.* PHILIP L. POE ᴇᴛ ᴀʟ.

*Wagering Contract—Purchasè of Shares of Stock on Margin—*
*When Valid—Burden of Proof—Stop Order to Sell Given*
*to Stock Broker—Insufficient Evidence of Agree-*
*ment to Carry Shares of Stock.*

If, under the semblance of a contract for the purchase of shares of stock at a future time, the intention of the parties is that the shares shall not be delivered and paid for, but that one party shall pay to the other the difference between the contract price and the market price at the date of settlement, then such agreement is a gambling or wagering contract. It is consequently illegal and no action lies upon it.

But a speculative contract for the purchase of stocks, when the buyer deposits a margin as security for his performance of the contract, is not necessarily a wagering contract.

The relation between broker and customer when goods are purchased on margin set forth.

A stop order is a direction given by the purchaser to the broker to the effect that if the stock touches the price named in the order, while it is being held, the broker shall sell it at the best available price; but it does not impose an obligation upon the broker to hold it until it reaches that price.

When a party alleges that the contract by which he purchased shares of stock from a broker on a margin was a gambling transaction, and seeks to avoid the same, the burden of proof is upon him to establish that allegation.

Plaintiff ordered a stock broker, the defendant, to purchase certain shares of stock, and deposited a sum of money as a margin on the transaction, and also executed a mortgage to the broker as further security. There was no agreement between the parties that the shares were not to be delivered. The broker purchased the shares for the plaintiff and was ready to deliver the same upon demand. The price declined on the market, and, upon plaintiff's failure to pay for and receive the shares or to furnish additional margin, after notice, the broker sold the same on the stock exchange. Plaintiff then filed the bill in this case alleging that the purchase of the stock was a wagering contract, and also that the defend-

ant had agreed to carry the stock for the plaintiff until it should decline to forty-five dollars per share, in consideration of which agreement plaintiff had executed the mortgage, but that the defendant, in violation of this agreement, had sold the stock at fifty-six dollars per share. The bill prayed that the mortgage be cancelled and that the defendant be required to repay the plaintiff the money deposited as a margin. *Held,* that the evidence fails to support the allegations of the bill or to show that the defendant had agreed to carry the stock for the plaintiff as therein alleged.

*Decided December 2nd, 1908.*

Appeal from the Circuit Court No. 2 of Baltimore City (GORTER, J.)

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE, THOMAS and HENRY, JJ.

*William S. Bryan, Jr.* (with whom was *Edwin Burgess* on the brief), for the appellants.

*J. Cookman Boyd, Wm. Milnes Maloy* and *George M. Brady,* for the appellees, submitted the cause on their separate briefs.

BURKE, J., delivered the opinion of the Court.

This case comes before us on appeal from a decree of the Circuit Court No. 2 of Baltimore City dismissing the appellants' bill of complaint filed in that Court. Bruno Richter, who is engaged in the chattel loan business in Baltimore City, had certain stock transactions during the months of August and September, 1907, with the appellees, who are stock brokers, and also the agents in Baltimore City of the New York brokerage firm of T. A. McIntyre & Co. The suit involves an inquiry into the nature of certain transactions concerning five hundred shares of stock of the Amalgamated Copper Company, upon which Bruno Richter had

paid to the appellees the sum of forty-two hundred dollars, and had given a mortgage on certain property in Baltimore County for ten thousand dollars as additional security in part payment of the purchase price of the stock. The specific relief prayed for in the bill is: *a.* That the appellees may be decreed to repay to Richter said sum of forty-two hundred dollars with interest; *b.* That they may be decreed to surrender to him the mortgage note of ten thousand dollars to be cancelled; *c.* That they may be decreed to release the mortgage and be enjoined from attempting or proceeding to sell the mortgaged property under the powers contained in the mortgage.

The two grounds upon which this relief is prayed for are: First, that the transactions respecting the purchase and sale of the stock were mere gambling, or wagering, contracts; secondly, that the appellees had agreed with Richter to carry the stock until it declined to forty-five dollars per share, and that in violation of their agreement they sold the stock at fifty-six dollars per share, and it is contended that because of this violation of the agreement Richter had a right to rescind the contract, and demand the release of the mortgage and recover the money paid by him to the appellees.

The bill alleged that while the transaction between him and the appellees was in the form of a purchase of said stock, it was in truth and in fact a mere gambling wager, there being no intention or belief on the part of himself or the appellees that the stock for the purchase of which orders had been given should ever actually be delivered to him, but that the sole purpose, as was well known to the appellees, was that there should be an accounting and settling of the differences as the stock rose or fell in market price, or as the appellant won or lost on his wagers; that the only expectation of all parties to the transaction was that when the wagering transactions were completed the settlement and adjustment should be made on the differences between the market prices of the stock at the time the orders to buy the same were given. That because of the breach of the contract by the appellees

to carry the stock to forty-five dollars per share, the reasonable expectation of benefit which Richter had when he delivered the money and the promissory note to the defendants had been disappointed by their wrongful conduct in selling the stock before it declined to that figure, and that he had served a written demand upon the defendants to return the money and note to him and to release the mortgage, which they had declined to do.

These grounds, upon which the relief prayed for rests, are explicitly denied by the answer. It admits that among the transactions had between themselves and Richter there were purchases of Amalgamated Copper Stock to the extent five hundred shares, but they deny that the transactions were a mere gambling wager, or that there was no intention or belief on the part of Richter, or the defendants that the stock for the purchase of which orders had been given should ever be delivered to him; they deny that the sole purpose was that there should be an accounting and settlement of the differences as the stock rose and fell in price; they deny that the transactions were wagers on the part of Richter; they deny that the only expectation of all the parties to the transactions was that they should be completed as set forth in the bill, and they alleged that they stood ready and willing to deliver to Richter all shares of stock that he had purchased.

From this statement of the pleadings it will be perceived that the two important questions presented for decision are: First, were the transactions mere wagering, or gambling, contracts, and therefore void? Secondly, was there an agreement between the parties to the effect that the appellees, in consideration of the execution and delivery of the promissory note and mortgage, would carry the stock until it should decline to forty-five dollars per share?

It is settled that "where the contract is that in case of a decline in the market price of the stock, the purchaser is to pay the difference between the contract price and the market price, and there is no intention that he shall receive and pay for the stock itself, the dealing is a gambling contract, and

. the law does not permit an action to be maintained upon it."
*Billingslea* v. *Smith,* 77 Md. 519; *Stewart* v. *Schall,* 65 Md.
290; *Cover* v. *Smith,* 82 Md. 614. Such a contract is null
and void. *Dryden* v. *Zell & Merceret,* 104 Md. 345. It is
said in *Irwin* v. *Williar,* 110 U. S. 508, that: "The generally
accepted doctrine in this country is, as stated by Mr. Ben-
jamin, that a contract for the sale of goods to be delivered
at a future day is valid, even though the seller has not the
goods, nor any other means of getting them than to go into
the market and buy them; but such a contract is only valid
when the parties really intend and agree that the goods are
to be delivered by the seller and the price to be paid by the
buyer; and if, under guise of such a contract, the real intent
be merely to speculate in the rise and fall of prices, and the
goods are not to be delivered, but one party is to pay to the
other the difference between the contract price and the mar-
ket price of the goods at the date fixed for executing the con-
tract, then the whole transaction constitutes nothing more
than a wager, and is null and void." If it appear that the
transaction is a gambling contract, the fact that it is clothed
in legal form will not avail. The Court will look through the
mere guise in which it is attempted to be conducted, and
will declare its true nature.

But there is a broad and well-recognized distinction be-
tween a gambling contract and a speculative contract for
the purchase and sale of stocks on margin. Such transactions
are valid. The true relations which exist between the broker
and the customer in such cases, in the absence of some spe-
cial agreement, where the stock is purchased on margin for
speculative account, are these: The broker undertakes and
agrees:

1. At once to buy for the customer the stocks indicated.

2. To advance all the money required for the purchase
beyond the per cent. furnished by the customer.

3. To carry or hold the stock for the benefit of the cus-
tomer so long as the margin agreed upon is kept good, or
until notice is given by either party that the transaction

must be closed. An appreciation in the value of the stock is the gain of the customer, and not of the broker.

4. At all times to have, in his name and under his control, ready for delivery, the shares purchased, or an equal amount of other shares of the same stock.

5. To deliver such shares to the customer when required by him, upon the receipt of the advances, commissions and interest due to the broker; or,

6. To sell such shares, upon the order of the customer, upon payment of the like sums to him, and account to the customer for the proceeds of such sale.

Under this contract the customer undertakes:

1. To pay the margin agreed upon on the current market value of the stock.

2. To keep good such margin according to the fluctuations of the market.

3. To take the shares so purchased on his order whenever required by the broker, and to pay the difference between the percentage advanced by him and the amount due the broker. *Markham* v. *Jaudon,* 41 N. Y. 235; *Richardson* v. *Shaw,* 209 U. S. 365, decided by the Supreme Court of the United States, April 6th, 1908.

The first question is: Does the evidence support the appellants' contention that the transactions between them and the appellees were gambling contracts for the purchase and sale of this stock? Whether they were mere wagers, or were valid purchases and sales on margin within the rules stated, were questions to be decided upon a consideration of all the facts and circumstances in the case. In determining these questions upon the record before us, in which appears upon the material issues of facts raised by the pleadings the most direct and irreconcilable conflict of evidence, two things must be remembered: first, that the law presumes the validity of the contract and that the burden of proof was upon the appellant to satisfy the Court of the truth of the essential facts alleged in the bill as the grounds for the recovery of the money paid and for the cancellation of the mortgage note;

secondly, that the greater part of the testimony—and it is. quite voluminous—was taken orally in the Court below before the Judge who decided the case. He, therefore, had the opportunity to observe the witnesses and their manner of testifying, and had the best means of deciding upon the value of their testimony. This circumstance, it is true, would not prevent this Court from reversing the decree if we found it was not warranted by the evidence; but where the question to be decided turns so largely, as it does in this case, upon the weight of testimony and the credibility of witnesses it is properly entitled to much consideration. We have examined and considered carefully the testimony appearing in the record, and have reached the conclusion that it does not sustain the contention of Bruno Richter, that the dealings had by him with the defendants with respect to the stock in question were gambling contracts; but that the transactions constituted a purchase and sale of stocks on margin.

This Court has repeatedly said that on a question depending entirely upon the evidence "no good result can possibly arise from a recapitulation of the evidence. It is enough for the Court to announce the conclusion it arrives at." *Sterling* v. *Sterling,* 64 Md. 138; *Moore* v. *McDonald,* 68 Md. 321. Here, however, a brief examination of the evidence, dealing with its nature and purport rather than with its details, may be appropriate. It is admitted that the appellees were stock brokers, and were the Baltimore agents of the brokerage firm of T. A. McIntyre & Co. It is admitted that Bruno Richter gave orders to the appellees to purchase the stock in question on margin, and that he, at different times after the orders were given, paid to the appellees sums amounting to forty-two hundred dollars, to be used as margins on the purchase of stock. It is also admitted that the promissory note and mortgage were executed and delivered as security for further or additional margin. It is now claimed that this was a mere sham—a guise to cover up a gambling scheme in order to protect it from the denunciation of the law; that it was never intended by the parties that the stock should be bought

or delivered by the seller, and that there was no intention on the part of either the sellers or the purchaser that the stock should ever be bought or delivered, and that the whole arrangement was in truth and in fact a mere gambling wager.

The evidence fails to make out this claim. On the contrary, it is clear and satisfactory that the transaction was strictly a purchase and sale of the stock on margin, and was conducted in the usual and accustomed way governing such transactions. The evidence of Poe and Davies and the employees produced by them at the trial, respecting the giving of the orders of purchase of the stock, is utterly inconsistent with the plaintiff's theory. It shows that the stock was actually purchased and paid for by T. A. McIntyre & Co., and could have been delivered to Richter had he paid for it. Mr. McIntyre testified that he had paid for the stock at the price shown upon the books of his firm, and that he had personal knowledge of that fact, and that any time from the date of the purchase he was ready to deliver the stock to Richter upon his paying for the same. This testimony is strongly supported by that of other witnesses and by circumstances appearing in the record, and is really uncontradicted. The stock was sold by McIntyre & Co. upon the New York Stock Exchange for fifty-six dollars per share; but before this sale was made the weight of the evidence is that a demand was made by Poe and Davies upon Richter to pay for the stock and take it up, or to put up additional margin to protect them. This he refused to do, claiming that Poe and Davies were under a contract with him to carry the stock until it should decline to forty-five dollars per share. It is a significant fact that at no time until the bill was filed did Richter claim that he and the appellees were engaged in a stock-gambling scheme. No such claim is made in the letter of his counsel to Poe and Davies, dated October 14th, 1907, in when he notified them that he considered the contract between them rescinded and made demand for the return of the money paid and the surrender of the promissory note, and the release of the mortgage, but he rested his right of rescission

exclusively upon the ground that the appellees had wrong-
fully and contrary to their agreement sold the stock before
it had declined to forty-five dollars per share. Assuming,
*ex gratia argumenti,* the truth of all the testimony produced
by the plaintiff, it does not certainly appear that the trans-
action was a gambling one. It is not pretended that there
was any express understanding that the stock was not 'to be
actually purchased for the account of Richter, and his testi-
mony as to what took place at the beginning of the course· of
dealing is so indefinite and uncertain as to be of little value
upon this inquiry. It seems to be reasonably certain that
Richter assumed that the transaction was a gambling one
from the *mere* fact that he was buying and selling on mar-
gin. This is obvious from his own evidence and that of
Mr. Burgess, who, when asked by the plaintiff's counsel if
it was understood between himself and Richter and Poe and
Davies that the settlement was to be made on differences and
that there was to be no actual delivery of the stock, answered
as follows: "That is the way·we understood it. I want to
say Mr. Poe and Mr. Davies never said to me that they
would not deliver. I want to be perfectly fair, but it was
understood he knew and we talked the matter over, that this
was simply a margin transaction, but they never told me and
I never told them— I want to be perfectly fair—— Mr.
Boyd: You never told them or they never told you what?
Witness: I would never take the stuff, and they never told
me. I said I was simply buying this on margin. I said, I
want to speculate on margin when I went there. He says
that it is five points on stock and three cents a bushel on
wheat. I never took a turn on cotton, so I do not know what
that was." It is settled by all the authorities that a specula-
tive transaction for the purchase and sale of stock on margin
does not constitute gambling. *Dryden Admr.* v. *Zell & Mar-
ceret,* 104 Md. 345; *Richardson*·v. *Shaw, supra.*

2. Nor do we find sufficient evidence of an agreement on
the part of the appellees to carry the stock until it should
decline to forty-five dollars per share. There is no written

evidence of such an agreemnct, and it would have been a most unwise and improvident contract for them to have made, as it might have tied up indefinitely the money invested by them in the purchase of the sotck. The Court ought not to be too ready to believe they would do such a foolish thing. It is true that both Mr. and Mrs. Richter testify that Mr. Poe did so agree; but this he positively denies, and the circumstances attending the execution of the mortgage and the delivery of the instrument of writing marked Plaintiff's Exhibit No. 3 strongly support his denial. The recital in that exhibit that Richter had requested the appellees to carry the stock on margin until it should reach a certain market price evidently refers to the stop-loss order at forty-five which he gave to the appellees on the day the mortgage was delivered, and does not imply, nor was it intended to mean, that they were unconditionally bound to carry the stock for that figure. A stop order is a direction given by the purchaser to the broker to the effect that if the stock touches the price named in the order, while it is being held, the broker shall sell it at the best available price; but it does not impose an obligation upon the broker to hold it until it reaches that price. It is a measure of protection which the purchaser provides for himself against loss beyond a certain point in a fluctuating market.

We think it most probable that the claim that there existed a contract such as that set up in the bill grew out of misconception, or misunderstanding, of the meaning and effect of that order. The appellants having failed to sustain either of the grounds of relief alleged in the bill, the decree appealed against will be affirmed. We are not, however, to be understood as deciding that the breach of the contract alleged would, under the facts in this case, assuming the contract to have been proved, have entitled the appellants to the relief prayed for.

*Decree affirmed with costs.*