# JOHN MAZEIKA

## *vs.*

## MARY MAZEIKA.

*Divorce—Evidence of Adultery—Presumption on Appeal.*

On a bill for divorce on the ground of the wife's adultery, the evidence of plaintiff's two witnesses presenting various inconsistencies, and defendant's testimony as to her innocence being corroborated by that of her employer to the effect that, at the time at which plaintiff's witnesses claimed to have seen her with another man, she was at work in her employer's shop, *held* that the finding of the lower court in her favor should be affirmed. pp. 582-590

The evidence produced by plaintiff and that produced by defendant being in irreconcilable conflict, the conclusion of the chancellor, who had the opportunity of seeing the witnesses and observing their conduct and demeanor on the witness stand, should not be disturbed unless there has been obvious error. pp. 588, 589

*Decided June 26th, 1923.*

Appeal from the Circuit Court No. 2 of Baltimore City (DUKE BOND, J.).

Bill by John Mazeika against Mary Mazeika. From a decree for defendant, plaintiff appeals. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, and OFFUTT, JJ.

*Richard E. Preece,* for the appellant.

*Lawrence S. Kaufman,* with whom were *Kaufman & Kaufman* on the brief, for the appellee.

Thomas, J., delivered the opinion of the Court.

This appeal is by the plaintiff, John Mazeika, from a decree of Circuit Court No. 2 of Baltimore City dismissing his bill for a divorce *a vinculo matrimonii*.

The bill, which was filed on the 19th of October, 1921, alleges that the plaintiff and the defendant were married on the 8th of August, 1902, and that they both reside in Baltimore City; that on the 14th of February, 1917, the defendant filed a bill for a divorce *a mensa et thoro* against the plaintiff, and obtained a decree on the 8th of January, 1919; that no children were born of said marriage, and that during the time they "lived together as man and wife, the plaintiff conducted himself as a kind, faithful and affectionate husband"; that the defendant has been "guilty of acts of adultery with divers men whose names are to this time unknown" to the plaintiff, and that the plaintiff has never condoned said acts of adultery, or "lived or cohabited with her since."

The defendant answered the bill on the 27th of October, 1921, admitting all the allegations of the bill except the alleged adultery and conduct of the plaintiff, which she denies, and alleging that she has always been "a chaste, kind and affectionate wife."

Notwithstanding the bill was filed in October, 1921, and the answer was filed within less than ten days from the filing of the bill, no evidence was produced until January 10th, 1923, when the plaintiff testified that he had lived in Baltimore City for twenty-eight years; that he and the plaintiff were married in August, 1902; that he had no children; that he had treated the plaintiff "very nice"; that plaintiff had obtained a divorce from him as alleged in the bill, and that he had not lived with her since, and then produced two witnesses, John Metalis and John Scankus. Metalis, after stating that he knew the plaintiff and the defendant, testified as follows: "Q. Mr. Metalis, did you ever have occasion to visit Mrs. Mazeika in the year 1921 or 1922? A. Yes, one time I worked on the street and stopped in on the corner and I find Mr. Mazeika and one man told that—he talked the

worst talk.   Q. I asked you if you ever visited Mrs. Mazeika?
A. Yes.   Q. Where?   A. On Portland Street.   Q. Do you
know the number?   A. 659, I believe.   Q. Where was Mrs.
Mazeika living, in what part of the house?   A. That house was
a wrong house.   Q. What floor did she live on?   A. Third
floor.   Q. Was she by herself or did she live there with some
one else?   A. She rented that floor.   Q. Was there anybody
there besides Mrs. Mazeika the day you called?   A. One day
I find a man who was an operator, my boss sent me to find
him and I looked for him.   Q. Who was it?   A. I forgot
that name, that man Novakage.   Q. Was he living there?   A.
He was living in that house, I do not know whether the man
was living on that floor, I cannot tell.   I find him on that
floor.   Q. Well, what did you and Mr. Novakage and Mrs.
Mazeika do at the time you visited that floor?   A. I just
find a bottle of whiskey on the table, I do not know nothing,
just I opened the door.   I saw that man right away and the
boss called, it was about half past twelve.   I opened the
door and see that lady just walking on the floor, I do not find
wrong something.   Q. They were together on that third
floor?   A. Yes.   Q. You found these two people on that
third floor at 659 Portland Street?   A. Yes.   Q. And you
had a drink of moonshine liquor?   A. I see that moonshine,
but I do not see the drink.   I see the bottle on the table, but
I know he used to drink steady, that man.   Q. I did not ask
you what he did.   Did you find these two people, Mrs. Ma-
zeika and John Novakage, on the third floor of 659 Portland
Street that day?   A. Yes, about June or about May.   Q. Of
last year?   A. 1921."   On cross-examination he said that
No. 659 Portland Street was Mrs. Kasdeliweitz' house; that
she owned the property, which was a private house; that the
house had three floors; that his boss sent him to get Novakage
to work; that he went to the house about half past twelve
"noon"; that a lady let him in the house, and he went up
stairs, and further testified as follows:   "Q. When you went
up stairs you saw Mrs. Mazeika, is that right?   A. No.   I
did not see Mrs. Mazeika.   I saw Mr. Novakage.   Q. Who

did you see when you got up stairs? A. I told you many times what I see, and I told you enough. Q. Tell me once more? A. I saw a bottle of moonshine on a table. That is all I saw. Q. How many people did you see on that floor? A. I do not know how many people lived on that floor. Don't ask me a question about that, but I know that lady rented that floor. That is all I know. Q. Did you see one person when you got up there or two persons? A. A man and lady, that is all I see. Q. What were they doing? A. I do not like any more questions, just nothing but what I am telling you I saw. I am going down, he says. I do not stay in the house long. I just said a few words. Q. Where was the woman when you got up there, what was she doing? A. She had nothing to do. Q. Was she sitting in the chair or walking around? A. She was walking around. She went in the other room. Q. And was the man walking around the room, too? A. He was sitting at the table looking for some moonshine. Q. Did he have his coat on or off? A. No, he had on a coat. * * * Q. Did he have on his hat, too? A. No. Q. Just had on his coat? A. Coat, that is all." On re-direct examination he testified as follows: "Q. Was there a bedroom on that third floor? A. No, a cook room, like a kitchen. I see one room. I do not see more."

Scankus, the other witness for the plaintiff, who testified through an interpreter, after stating that he knew the plaintiff and the defendant; that he knew the defendant in 1921, and that she lived on Baltimore Street and afterwards moved to 659 Portland Street; that he knew John Novakage, and that he made coats, testified as follows: "Q. Ask him if John Novakage ever lived at that house, if he knows? A. Yes, sir. Q. Ask him if he visited there in the year 1921 and saw Novakage there? A. Yes, sir, I was there. Q. Ask him what caused him to go there? A. I was working on McCulloh Street and we had to have an operator and I was looking for Novakage. Q. Did you find him? A. I found him sleeping in the bed with a woman. Q. Did he find him? A. I found him on Portland Street on the third floor. Q.

How long have you been in this country? A. Fifteen years. Q. You can speak English if you have been here fifteen years, can't you speak English? A. Only small words. Q. Ask him what time in the day it was he went to this place to find Novakage? A. About nine o'clock. Q. In the morning or in the evening? A. In the morning. Q. Does he know what month it was? A. About in the fall, about September, and we made overcoats. Q. Was he by himself or was some one with him on the third floor when you went to see him? A. I find him with a woman. Q. Ask him if he knows who the woman was? A. Mrs. Mazeika. Q. Were they up undressed or where were they? A. She was in a red petticoat and Novakage was in his white pants. Q. Was the lady in bed or up? A. In the bed. Q. Novakage was not dressed? A. Had white pants on. Q. Is he sure the lady was Mrs. Mazeika? A. Yes, sir; sure it was Mrs. Mazeika." On cross-examination he further testified: "Q. What year was this? A. Two years back, one year back. Q. In 1921? A. Yes. * * * Q. When did you tell Mr. Mazeika about this? A. I told him in about two weeks time, Novakage had your wife and is living with your wife. Q. How much is Mr. Mazeika giving you for coming to court? A. He is not paying me nothing. They let me out because my finger is sore and I just come up. Q. What time of the day was this you were there, nine o'clock in the morning? A. Nine o'clock in the morning. Q. And the woman was in bed? A. Yes, Novakage was in bed, both in the bed. Q. Did you go in the bedroom or in the kitchen? A. I walked in the kitchen and the door was open, there was nothing in the kitchen and I walked in the front room. Q. Was there any covers over the woman? A. When I opened the door there was nothing on her. Q. No covers on her? A. No. Q. She was lying on the bed without any covers on her? A. Covered about that much (indicating). Q. How could you see the color of her petticoat then? A. The covers were a little bit off and I saw they were red. Q. Show us what part was covered? A. Just that much (indicating). Novakage was sleeping on

the side of the wall and she was sleeping on the other side. Q. Was the man in bed also? A. Yes. Q. Didn't you say a minute ago that the man was walking around the room in white pants? A. He got up out of bed and let him out of the door and he told him to come down to work. Q. And it was nine o'clock in the morning? A. Yes. It might be a little after ten or nine. Q. Who let you in the room? A. It was such a bum house the doors were wide open. Q. Did the woman turn her head towards you or away from you when you walked in the room? A. Moved like that (indicating) on the side. Q. How could you see her face then? A. As soon as I swung the door open she turned her head on the side. Q. You could see her face though? A. Yes. She started to talk to me. Q. Did she have on shoes? A. I did not see her shoes. Q. Did she have on a hat? A. No. Q. Did the man have on a coat? A. No; just the pants. Q. Did he have no shoes? A. No. Q. How far past the door did you get? A. I was right to the door. Q. You did not go inside? A. He says, what do you want? When he opened the door. Q. They did not let you inside the room? (Witness described in the court room by opening a door and sticking his head in the next room.) Q. You just put your head inside the room and not your body? A. When I see a man and lady sleeping in the bed I don't want inside the room. Q. You did not walk in the room? A. Just one foot. Q. Didn't you stay in the hall or passage and not go into the room? A. When I seen him with the lady I just ducked back and said, what do you want, what do you want? And I just stepped back and stood on the steps. Q. You were at no time inside the bedroom itself? A. He says he was sleeping in the bed. Q. Answer my question. You were at no time in the bedroom itself? A. No, the first time I was there in my life. Q. Ask him if that is correct, that he did not get inside the bedroom? A. I was by myself. I cannot prove it. If you don't want it, don't believe it. I was not in it. Q. Did you get inside the bedroom? (The Court): Q. What room did you look into? A. The first time in the

kitchen and in the front room they call the bedroom. I seen him when he was sleeping in the front room. Q. When you got your head inside the door where was the man? A. In bed. Q. Was his face turned toward you? A. No. When I opened the door they looked straight to the door."

The defendant testified that she was forty-nine years old and lived with her son and his wife at 603 Washington Boulevard; that she worked, sewing buttons on coats. When the witness Scankus was pointed out to her in the court room, and she was asked whether she knew him, she said that she did not and had never seen him before in her life; that his statement about seeing her in bed with a man was false and that she had never been in bed with Novakage or any other man except her husband, and had never done anything wrong with any man; that she lived with Mrs. Kasdeliweitz at 659 Portland Street, and on the third floor of that house, for two years, and paid her at first six dollars and later seven dollars a month rent; that no man had ever lived there with her and that the only man ever seen in her room was her son, who was about twenty-six years old; that she worked all the time in 1920 and 1921 for Vincent Yuskievitz, 417 South Paca Street, and on September 26th, 1921, she moved from Mrs. Kasdeliweitz' house to her son's home on Washington Boulevard; that she did not lose any days from work in September, 1921, and went to work every morning about seven o'clock; that she worked for Vincent Yuskievitz for about three years; that she got up every morning about half past five and went to work about seven o'clock; that she still works; that she brings home some coats and works at home some times until twelve o'clock at night; that she had always been a good wife to the plaintiff, but that he had "treated" her "like a dog."

Vincent Yuskievitz testified that he was engaged in the business of making custom coats and stock coats at 417 South Paca Street; that the defendant had worked for him for two and a half years; that she worked for him in September, 1921, and never missed a day in that month; that his shop

opened every morning at half past six or seven o'clock, and that the defendant never came to work in September, 1921, after nine o'clock in the morning; that his books show the days she worked, and that he saw them the "other day," and would produce them in court if desired. On cross-examination he said that the plaintiff worked every day, and was still working for him, and that he could take his books and show the days she worked. Mrs. Mason, the defendant's daughter-in-law, testified that the defendant lived on Portland Street for about two years, and until the 26th of September, 1921, when her husband and herself purchased their home on Washington Boulevard and she came to live with them, and that her husband was twenty-eight years old. When asked if she had heard the testimony of the witness Scankus, she replied, "Yes, I did, Mr. Kaufman, and he did not tell the truth." The rest of her testimony was stricken out by the court below on motion of the plaintiff. The decree in the case of Mrs. Mazeika against the plaintiff, referred to in the bill and in the evidence, was also offered in evidence, and it appears that the defendant was, on the 8th of January, 1919, granted a divorce *a mensa et thoro* from the plaintiff in this case, and that he was required to pay her two dollars per week as permanent alimony, and to pay Kaufman & Kaufman, her attorneys, a fee of $250.

We have referred to the evidence at some length because it shows a sharp and irreconcilable conflict between the testimony produced by the plaintiff and the testimony of the defendant, in which she is strongly supported by the testimony of her employer, who offered to produce his books in further corroboration of her positive denial of the conduct attributed to her by the plaintiff's witnesses. Under such circumstances the conclusion to be reached must depend largely upon the credibility of the witnesses, and where that is the case the chancellor, who had the opportunity of seeing the witnesses and observing their conduct and demeanor on the witness stand, has a distinct advantage over the appellate court, and his conclusion ought not to be disturbed unless there has been

obvious error. As early as the case of *Jennings* v. *Pendergast*, 10 Md. 346, CHIEF JUDGE LE GRAND had occasion to say: "These witnesses are unknown to this Court, as are, also, those who prove her imbecility. The credit to be attached to their evidence, in some degree, would depend upon their appearance, and their manner of giving it. We have been deprived of this advantage; the orphans' court enjoyed it, and we cannot be insensible to the value of the conclusions which it enabled them to derive from it. * * * Repeating, were it not for the positive evidence of Mr. White, and others, that we would hold the testatrix to have been incompetent at the time to have made a valid will, and the suspicions surrounding the transaction, yet we cannot feel ourselves justified in reversing the order of the orphans' court." And this Court has more recently, and in several instances, recognized the importance of the advantage referred to, and the consideration that should be given to it. In the case of *Richter* v. *Poe*, 109 Md. 20, JUDGE BURKE said, in determining the questions in that case, as to which there was direct and irreconcilable conflict of evidence, "two things must be remembered," and after stating the first, he said, "secondly, that the greater part of the testimony * * * was taken orally in the court below before the judge who decided the case. He, therefore, had the opportunity to observe the witnesses and their manner of testifying, and had the best means of deciding upon the value of their testimony. This circumstance, it is true, would not prevent this Court from reversing the decree if we found it was not warranted by the evidence; but where the question to be decided turns so largely, as it does in this case, upon the weight of the testimony and the credibility of the witnesses it is properly entitled to much consideration." See also *Miller* v. *Miller*, 140 Md. 60.

In addition to the weight that should be given to the fact that the testimony in this case was taken before the learned chancellor who dismissed the plaintiff's bill, the evidence produced by the plaintiff bears marks of weakness other than those attributable to the manner and demeanor of the wit-

nesses. Scankus, the most important witness, testified that he told the plaintiff what he had seen in September, 1921, about two weeks after his visit to the defendant's rooms on Portland Street, yet when the plaintiff filed his bill only a few weeks later he alleged that the defendant had been guilty of adultery with men whose names were unknown to him. Again, the same witness first testified that he walked into "the kitchen and the door was open, there was nothing in the kitchen and I walked in the front room," and later, when pressed by counsel for the defendant, he said that he did not go into the front room, but simply stuck his head inside the door, and in another part of his testimony he said he went to the door, and that Novakage opened the door and said "What do you want." He also said when first asked if the defendant had any covers over her when he saw her in bed that "there was nothing on her," and later testified that she was partly covered, but that he could see that she had a red petticoat on. The witness Metalis at one time testified that when he went to the defendant's rooms she was walking around and "went in the other room," and later, when asked on re-examination by counsel for plaintiff if there was a bedroom on the floor on which the defendant lived, he said "No." that he saw one room "like a kitchen," but did not see any other room. Another but less important feature of the plaintiff's evidence is that, notwithstanding the defendant obtained a divorce *a mensa et thoro* from him about two years before, and her statement that he had treated her "like a dog," he testified in this case that he had "treated her very nice." In view of these contradictions and inconsistencies in the plaintiff's evidence we would not be justified in reversing the decree of the court below, and it will, therefore, be affirmed.

*Decree affirmed, with costs.*