## CHARLES M. NES *vs.* THE UNION TRUST COMPANY OF MARYLAND.

*Gaming and Wagering Contracts—Agreement to Purchase First Mortgage Bonds to be Subsequently Issued—Substantial Compliance with Contract to Deliver First Mortgage Bonds— Time Not of the Essence in Equity—Defective Acknowledgment of Deed Cured Before Decree.*

The members of a syndicate for the purchase of an issue of railway bonds from a trust company signed a contract by which they agreed with each other and the trust company to purchase the number of bonds set opposite their respective names and make payment therefor when called upon at 90 per cent of the face value   It was provided that the trust company as syndicate manager should call for payment of the subscriptions at its discretion and should also have power to sell, for *pro rata* account of the subscribers all or any of the bonds subscribed for at not less than 97½ per cent, at any time prior to a designated date when the syndicate would be dissolved.   *Held*, that this agreement is not a gambling or wagering contract, since it was not the intention of all the parties that no bonds should be actually delivered, and the trust company had the right to compel a subscriber to accept and pay for the bonds subscribed for by him, if they had not previously been sold at the higher price to third parties for his benefit.

Plaintiff agreed, as one of several underwriters of an issue of bonds, to purchase from the defendant a certain number of the bonds of a street railway company under a contract and prospectus which stated that the bonds were to be issued by the company as part of an issue of one million dollars, and would be secured by a first mortgage and only lien on the property of the company.   It was provided that the bonds could be delivered to plaintiff and payment of his subscription demanded at any time during the year ending September 1st, 1903.   After paying a part of his subscription plaintiff signed an agreement extending the time for the completion of the contract to September 1st, 1904.   Plaintiff filed the bill in this case asking that his subscription be annulled and the money paid thereon returned on the ground that the prospectus and agreement contained misrepresentations and that the defendant was not, prior to September 1st, 1904, able to deliver the bonds contracted for.   These allegations were based on the fact that there was a prior mortgage of $250,000 on some of the property of the railway company, and also that there was a defect in the acknowledgment of a deed by which a part of its property was conveyed to that company. The evidence showed that of the 250 bonds secured by the prior mortgage all but four had been paid and cancelled prior to September, 1904,

that three of the remaining four were paid September 2nd, and the last bond shortly thereafter, before which time the holder could not be reached. As soon as attention was called to it the defective acknowledgment of the above-mentioned deed was cured by a confirmatory deed. Plaintiff knew, when making his subscription, that the bonds were not then issued, but were to be subsequently issued under a mortgage to be thereafter executed. At the time of the trial of the cause below the defendant was able to tender to plaintiff bonds in all respects conforming to the description in the agreement and prospectus. *Held*, that in equity time is not of the essence of this contract so as to render a delay of a few days in procuring a technical release of the prior mortgage, and in curing the defective acknowledgment, a vital breach of the contract on the part of the defendant, and that since the defendant had substantially complied with the agreement, the plaintiff is not entitled to be released from his subscription.

*Decided June 16th, 1906.*

Appeal from the Circuit Court for Baltimore City (STOCK-BRIDGE, J.)

The cause was argued before MCSHERRY, C. J., PAGE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*John Prentiss Poe* and *Edgar Allan Poe* (with whom was *Jas. St. Clair McCall* on the brief), for the appellant.

For the appellant it will be argued:

*First.* That the syndicate agreement was in no sense whatsoever in the nature of a gambling contract.

*Second.* That even treating it is a gambling contract, it related to a matter not *malum in se* but merely *malum prohibitum*, and that inasmuch as the contract had not been completely performed by both parties, the appellant was at liberty to withdraw from the same and to seek the aid of a Court of equity in recovering what he had paid thereunder.

*Third.* That by the true interpretation of the contract and of the prospectus accompanying the same at the time the appellant signed it, the appellant subscribed for first mortgage five per cent gold bonds of the Philadelphia, Bristol and Trenton Street Railway Company, and that the time of payment for the same and the time of the delivery of the same

were of the essence of the contract, and that inasmuch as concededly the appellee was not able and never was able to deliver to the appellant by the first of September, 1904, the time fixed by the contract, first mortgage five per cent gold bonds of the Philadelphia, Bristol and Trenton Street Railway Company, the appellant was thereby relieved of all liability to pay for the same and was entitled to receive back from the appellee the three thousand dolllars previously paid by him to the appellee, with interest from the date of payment.

*Fourth.* That the rights of the appellant are to be determined only by reference to the terms and provisions of the syndicate agreement and the prospectus accompanying the same, and that as neither of these papers contain any reference to the outstanding first mortgage for $250,000 executed by the Philadelphia, Bristol and Trenton Street Railway Company dated the 30th of December, 1901, the appellee had no right to take the money of the appellant, or any part thereof, paid to it for first mortgage bonds, in order to convert second mortgage bonds into first mortgage bonds, by paying off with the said money thus received a previous outstanding issue and superior lien, not known by said appellant to exist at the time of his said subscription and payment.

*Fifth.* That the prospectus provided that the bonds would be secured by an absolute first mortgage and only lien upon all property and rights now owned, or which may be hereafter acquired by the company, and that the company had succeeded to all the property and rights of the Philadelphia and Bristol Passenger Railway Company and the Bristol Passenger Railway Company, whereas, by reason of a defect in the acknowledgment of the deed dated December 30th, 1901, from the Bristol Passenger Railway Company to the Philadelphia,. Bristol and Trenton Street Railway Company, which defect was not remedied until September 29th, 1904, the Philadelphia, Bristol and Trenton Street Railway Company had no valid legal title to the property of the Bristol Passenger Railway Company thus attempted to be transferred to it by the said defectively acknowledged deed, and hence the mortgage

dated the first of September, 1902, was not an absolute first mortgage and only lien upon said property covered by said deed.

*Fielder C. Slingluff* and *Edward N. Rich* (with whom was *T. Wallis Blakistone* on the brief), for the appellees.

The Trust Company did advance or borrow on the faith of the plaintiff's agreement the full balance to be paid by the plaintiff, and the full amount so borrowed or advanced had been expended in constructing the railway before this suit was filed, and this is, therefore, a suit to rescind an executed contract.

The agreement also authorized the Trust Company to sell the securities which Nes agreed to purchase at any time before September 1st, 1903, at a small advance over the contract price; the period within which the Trust Company was authorized to sell the securities, was sometime in August, 1903, extended with the written consent of Nes until September 1st, 1904. At the time that Nes agreed to this extension the Trust Company notified him that a loan had been made or procured by it upon a pledge of his agreement, and that such loan would be continued for the period of the extension.

On or about August 19th, 1904, the Trust Company called upon Nes to pay the balance due on his subscription or purchase on or before September 1st, 1904. On the 31st day of August, 1904, the plaintiff filed the original bill of complaint, asking that his agreement be declared void; that the Trust Company be restrained from enforcing any rights under it, and be required to account for the three thousand dollars, with interest, paid by the plaintiff.

The plaintiff well knew that he was buying bonds to be thereafter issued under a mortgage to be thereafter executed, upon a railroad then in course of construction. He knew that the whole matter was *in fieri*, and that the money realized from the bonds that he agreed to buy was to be used to complete the consolidation of the properties and to pay off the existing debts, and that the bonds were not to

be delivered to him until these things were done, *and were then to be first mortgage bonds.*

If the cause for rescinding a contract, although existing at the time contract is made, and when suit for its rescission is filed has been removed at the time of the hearing, a rescission will not be decreed.

All objections to and defects in the bonds made by the plaintiff had been removed long prior to the hearing in the Circuit Court. In *Buchanan* v. *Lorman*, 3 Glll, 77; it is said: "The ability of the vendor to convey should exist when his duty by the contract arises to convey or at the time a decree for conveyance, where time is not of the essence of the contract."

The great weight of authority is that a vendor is only required to be able to convey a good title by the time the decree is entered, if time is not of the essence of the contract and he acts in good faith. *Maryland Construction Co.* v. *Kuper*, 90 Md. 542; *Foley* v. *Crow*, 37 Md. 51.

In *Brewer* v. *Herbert*, 30 Md. 301, specific performance of a contract to purchase a house and lot was sought. The defense was that, at the date of the contract, there was a judgment against the vendor for more than two thousand dollars, which was a lien on the property in question. An appeal had been entered from that judgment, and an appeal bond with proper security given. "The authorities are clear that equity will not compel a vendee to take an imperfect or defective *title*, yet cases of high authority are to be found in which a pecuniary charge against which adequate security has been given, has been held not to constitute a defect in *title*, and also where equity has enforced the agreement where a perfect title can be made at the time of the decree." *Kimball* v. *West*, 15 Wallace, 379, approved at length in 54 Md. 14.

In *Clanton* v. *Burges*, 2 Dev. Eq. 15, affirmed in *Hughes* v. *McNider*, 90 N. C. 252, it is said, "It is undoubtedly the law of this Court that the vendor may complete his title pending the suit, and at any time before the hearing. He is allowed to make good his contract and buy his peace." *Westall* v. *Austin*, 40 N. C. 1; *Bradfeldt* v. *Cooke*, 40 Pac. Rep. 4.

The time of the delivery of the bonds to the plaintiff was not of the essence of the contract. When the plaintiff signed his agreement in August, 1902, he knew it was uncertain when the bonds would be ready for delivery; he then agreed that they might remain under the control and at the disposal of the Trust Company until September, 1903; in September, 1903, he agreed that they might remain under the control of the Trust Company for another year.

There is no proof that the plaintiff has sustained any loss by any delay to deliver his bonds.

The appellant's action in filing the bill was premature, and said bill, conceding all its averments to be true, should not have been filed before the second of September, 1904.

JONES, J., delivered the opinion of the Court.

In August, 1902, the appellant in this case entered into an agreement in writing to purchase of the appellee corporation twenty first mortgage bonds par value $1,000 of the Philadelphia, Bristol and Trenton Street Railway Company, a corporation organized under the laws of Pennsylvania.

The agreement recites that "Whereas the Union Trust Company of Maryland (appellee) has acquired the right to purchase six hundred and fifty thousand ($650,000) dollars face value of the first mortgage five per cent gold bonds of the Philadelphia, Bristol and Trenton Street Railway Company, being a part of the total issue of one million ($1,000,000) dollars in bonds to be issued by said company to bear interest from September 1st, 1902, the remaining three hundred and fifty thousand ($350,000) dollars in bonds being reserved by the railway company and held by the trustee for further extensions and improvements, as set forth in the prospectus hereto annexed marked 'A' and has also acquired the right to purchase one hundred and ninety-five thousand ($195,000) dollars, par value, of the capital stock of said railway company, being part of a total issue of one million dollars ($1,000,000) par value of capital stock; and whereas, the undersigned, hereinafter designated subscribers, are desirous of

purchasing from said Trust Company the said bonds and stocks at the price and upon the terms and conditions herein-after set forth. Now, therefore, this agreement witnesseth, that the subscribers do each hereby respectively agree, each acting for himself and none other, with the Union Trust Company of Maryland and with the other subscribers, and each of them as follows:"

Then follows the agreement of the subscribers to purchase the number of bonds set opposite their respective signatures or such less number as may be allotted to them respectively and such number of shares of stock as, at par value, will equal 30 per cent of the amount of bonds allotted to them and "make payment therefor at ninety per cent of the face value of the said bonds as allotted together with accrued interest * * * as and when called upon to do so," and upon failure of any subscriber to so make payment the Trust Company to have the right to sell his interest in the bonds and stock, subscribed to, either at public sale at the stock board or by private sale, and to purchase the same and make the subscriber liable for any deficiency of the proceeds of sale to pay his subscription. It is then agreed that the Trust Company shall be appointed syndicate manager with power and discretion to call for and receive payment of subscriptions "at such times and in such amounts as to it may seem best;" that it "shall issue to the subscribers negotiable syndicate receipts upon which shall appear amount paid;" that it may "sell for *pro rata* accounts of the subscribers all or any" of the bonds subscribed for "at not less than ninety-seven and one-half per cent (97 ½ %) and accrued interest and account for same to said subscribers * * provided such sale be made on or before the first day of September, 1903," when or prior thereto the syndicate could be dissolved at the discretion of the syndicate manager; that the syndicate manager be authorized on behalf of the subscribers to borrow money for their benefit on such terms as to it might seem fit to carry out the object of the syndicate agreement "and to pledge as security for such loan their subscriptions—with all securities

covered by" the same; and finally it was agreed that the agreement should not take effect until the entire $650,000 of bonds should be subscribed for.

The period within which, under the foregoing agreement, the Trust Company was authorized to sell the securities or bonds in question and dissolve the syndicate was, just prior to September 1st, 1903, the time limited therein, extended by written agreement signed by the appellant for one year from that date. The original agreement was signed by a sufficient number of subscribers to, with the appellant, take the whole of the $650,000 of bonds mentioned therein; and it appears in evidence that all of the subscribers, except the appellant, have paid their subscriptions, and the bonds subscribed for have been delivered to them. Upon a call made upon the appellant for the payment of the balance of his subscription, of which he had paid $3,000 at or about the time of his subscription to the agreement, he refused payment, and, on the 31st day of August, 1904, filed in the Circuit Court for Baltimore City his bill of complaint which inaugurated the proceedings in which was passed the decree now the subject of his appeal to this Court. The allegations of the bill need not be set out at length. It prayed that the appellant's agreement of subscription for the bonds in question be adjudged and declared null and void, and that the appellee be required to surrender the same for cancellation and be enjoined from setting up any rights thereunder; and be enjoined from attempting or prosecuting any proceedings for the enforcement thereof; and be decreed to account for and pay over to the appellant the $3,000 paid by him on account of said subscription; and for further relief.

The allegations of the bill and the proofs show that, with but little pains, the appellant could have made himself aware of all of the grounds he now urges for relief before he entered into the agreement in question and of course could have refused to unite therein if there was in the proposed subscription anything unsatisfactory to him; and after he made his subscription, and up to the time the call was made upon him to

pay the same, every fact and circumstance was open and accessible to him that go to make up his grounds of relief. After the lapse of a year from the time of making his subscription he renewed his agreement and gave it new life for another year without any attempt to first inform himself if conditions were satisfactory to him.   After obtaining the information upon which he now bases his claim to relief he did not call the attention of the appellee to the conditions that he deemed unsatisfactory and demand and give opportunity, to have the same remedied or removed that he might carry out his contract.   He ignores his agreement as respects the other subscribers with whom he contracted in express terms as well as with the appellee; and to whom he owed good faith if nothing more.   He seeks to set aside the contract after the appellee has acted upon the faith of it by borrowing money upon his and other subscriptions for the common benefit of all interested under the agreement; and after performance of it by all of the other subscribers.   Further than this he can get now exactly what he alleges he contracted to get; could have gotten it at the time of the trial of the case below, and before; and it is rendered probable from what appears in the case that he could have gotten it without instituting the proceedings at all.   It does not appear that he has sustained any loss or injury from anything complained of.   Under these circumstances the considerations that would induce a Court of equity to grant relief here prayed or sought, it would seem, ought to be such as it would not be possible to ignore.

Before adverting to other aspects of the case the ground of the decision of the Court below may be noticed.   The learned Judge there held that the agreement in controversy was a gambling contract and unenforceable on that ground. With that view we do not agree.   The rule by which contracts are to be judged in the regard under consideration would seem to be well stated as the result of the authorities in 20 *Cyc.*, 926–931, where it is said:   "In the absence of some constitutional or statutory provision to the contrary, a contract for the sale of stock or other commodity to be deliv-

ered at a future day, is valid, even though the seller has not the goods and has no other means of getting them than to go into the market and buy them before the day of delivery, provided that the parties really intend that the goods are to be delivered by the seller and that the price is to be paid by the buyer. And where stocks or commodities are bought and sold, although upon speculation and on margin it is not a gambling transaction if it is understood by the parties that they are to be delivered and paid for. If however, under the guise of a contract of sale, the real intent of both parties is merely to speculate in the rise and full of prices, and the property is not to be delivered, but at the time fixed for delivery one party is to pay to the other the difference between the contract price and the market price the whole transaction is a wager and invalid. If this unlawful intent is entertained by only one of the parties, the transaction is not illegal, in the absence of statute to the contrary. The true test of the validity of a contract for future delivery is whether it could be settled only in money and in no other way, or whether the party selling could tender and compel the acceptance of the particular commodity sold or the party buying could compel the delivery of the commodity purchased * *; the essential inquiry in every case is as to the necessary effect of the contract and the real intention of the parties." Among other cases referred to in support of the text is that of *Appleman* v. *Fisher*, 34 Md. 540, which is in point. Of other cases decided in this Court to which reference may be made as defining the essential characteristics of a gambling contract of the class now being considered are *Stewart* v. *Schall*, 65 Md. 289; *Billingslea* v. *Smith*, 77 Md. 504; *Cover* v. *Smith*, 82 Md. 586, cited in appellant's brief.

The contract here in question is not a gambling contract on the face of it and it seems manifest the parties to it did not so regard it. All of the bonds other than those in controversy in this case have been delivered to the subscribers and the subscriptions paid. The appellant's bill here is based on the theory that it was the intention of the agreement, at the

time of its execution, that he should take and pay for the bonds he subscribed for when, by the terms of the agreement, he was called upon to do so; and the appellee evidently acted in the premises upon that view of the meaning of the contract. It had obtained potential control of the bonds before offering them for sale; and in carrying out the contract of sale tendered the bonds and demanded payment of the subscription price.

We come now to the grounds of relief appearing in the allegations of the appellant's bill.   As to some of these allegations no evidence was offered and there has been no attempt to sustain them.   Attention need only be given to those which are relied upon in the appellant's belief.   These are as we understand them that the appellant was misled, by the agreement he signed and by a prospectus exhibited to him before making his subscription, into believing that the bonds which the Union Trust Company, appellee, were selling and that he "was agreeing to buy were first mortgage five per cent gold bonds of the Philadelphia, Bristol and Trenton Street Railway Company, a corporation organized under the laws of Pennsylvania;" but that he has now discovered that this was contrary to the fact, and was also misled by the representation that the railway company just mentioned "had a valid indefeasible title to the whole of the property described in the mortgage securing the said bonds and against which property the said mortgage was represented" by the appellee "to be the first lien;" and this he has also discovered to be contrary to the fact.   The basis of the first alleged misrepresentation is that at the time of the agreement of subscription which the appellee signed there was upon record against the property of the railway company which was to be mortgaged to secure the $1,000,000 issue of bonds a mortgage for securing an issue of bonds to the amount of $250,000, and which was not fully and technically released prior to September 1st, 1904, the time limited by agreement for the consummation of the transaction between the appellee and the subscribers for the bonds here in question.   Now the appellant was, under the

agreement, upon compliance therewith by him, to get first mortgage bonds and the prospectus referred to contained this representation "these bonds will be secured by an absolute first mortgage and only lien upon all property and rights now owned or which may be hereafter acquired by the company." It also appeared in the recitals of the agreement that the bonds in question were to bear interest from September 1st, 1902. The agreement is not dated but it appears in evidence that it was signed by the appellant about the middle of August, 1902.

The appellant could not have been misled into supposing that the bonds had been issued and were existing as first mortgage bonds at the time he signed the agreement because he testifies that at that time his attention was called to the fact that they "were to be thereafter issued." He also said "I understood that the bonds were about to be issued and would be ready for sale at some time during the year or at the expiration of the year." When asked "from whom did you have that understanding?" answered, "I think that was implied in the underwriting agreement." This shows that he understood it would be a compliance with the agreement if first mortgage bonds were delivered to him at any time during or at the expiration of the year ending September 1st, 1903, the time fixed in the original agreement for a consummation of the transaction to which it related. Before the expiration of that year he signed an agreement extending the time for such consummation until September 1st, 1904. Prior to this latter date he was offered the bonds. At the time the mortgage for the $250,000 on the railway property still had a technical existence. It had not been formally released, but the testimony is that immediately after the execution of the agreement signed by the appellant, whereby he subscribed for the bonds in question, a fund was set apart for the redemption of the bonds secured by that mortgage and the extinction of the mortgage; that all of the bonds were taken up and cancelled soon after except 36. Of these 36 all but four had been paid prior to September 1st, 1904, and three out of the

remaining four were paid September 2nd, 1904.   The remaining bond was subsequently paid and there was a formal release of the mortgage securing these bonds before the case was tried below.   There was in the mortgage a provision for the right of the railway company to redeem any or all of the bonds on the first day of any month by giving thirty days notice in writing to the holders thereof of the intention so to do; and there was evidence that delay in redeeming the bonds was due to not being able to reach the holders of the few bonds that were last redeemed.   At the time therefore of the decree below the appellee was in a position to deliver to the appellant exactly what the contract between them called for; there was evidence to show that on the part of the appellee good faith and diligence had been observed; and there is nothing to show any injury or loss to the appellant by the delay in getting a formal release of the mortgage of $250,000 which had been substantially paid by a cancellation of the larger proportion of the bonds and payment of it provided for as to the balance by a fund being set apart for that purpose.   There is undoubtedly shown a substantial compliance with the stipulation in the agreement in question that the subscribers thereunder should have *first* mortgage bonds; and there is significance and force in the fact that all of the other subscribers have so regarded it and have all complied with the agreement and accepted the bonds.

It is urged, however, that time is of the essence of the contract evidenced by the agreement in question, and that therefore not having been fully performed with reference to the time indicated therein for the consummation of the transaction the appellant had the right to rescind it.   The contract in question, however, cannot fairly be construed with such strict reference to the time limited for its performance as to justify a Court of equity in decreeing its rescission for the reasons that have just been considered.   There is shown no essential or substantial refusal or failure to perform the contract on the part of the appellee.   There was in fact a substantial compliance with the contract.   The failure alleged, or

rather the facts relied upon to show failure of performance by it were only the incidents to accompany its formal completion. In 1 *Story Eq. Jur.,* sec. 776, it is said, "Time is not generally deemed in equity to be of the essence of the contract, unless the parties have expressly so treated it, or it necessarily follows from the nature and circumstances of the contract. It is true that Courts of equity have regard to time, so far as it respects the good faith and diligence of the parties. But if circumstances of a reasonable nature have disabled the party from a strict compliance, or if he comes *recenti facto*, to ask for specific performance; the suit is treated with indulgence, and generally with favor by the Court." The author also says in the same section that "one of the most frequent occasions on which Courts of equity are asked to decree specific performance of contract, is where the terms for the performance and completion of the contract have not, in point of time, been strictly complied with."

These principles have been reiterated and applied so frequently that it is unnecessary to cite particular cases. They would seem to be peculiarly applicable in the circumstances of this case. In applying them if the appellee were before the Court seeking a specific performance of the contract in question the application should meet with indulgence if not with favor. On the other hand when the appellant is before the Court not averring himself able, ready and willing to perform his part of the contract but in an attitude of unwillingness to perform the same urging no meritorious and substantial, but entirely technical and unsubstantial grounds therefor, the law requires that his application should be received with disfavor.

The basis of appellant's other charge of misrepresentation is that a part of the property covered by the mortgage securing the $1,000,000 issue of bonds was represented to have been acquired by the mortgagor railway company from the Bristol Passenger Railway Company whereas by a defect in the acknowledgment of the deed from the latter company to the former no valid legal title had passed to the mortgagor

company.   This appears to have been the result of a clerical error by which the acknowledgment in question was made to appear as that of the grantee corporation instead of that of the grantor.   The deed seems to have been in proper form and a good conveyance in every other respect, and the mortgagor company appears to have been in possession of the property the deed purported to convey.   The defect in the deed was cured immediately upon attention being called to it by a confirmatory deed.   No injury nor inconvenience was occasioned in any way to any person by reason of the error and it had been corrected prior to the trial of the case below.' The same considerations which apply to the allegations of the existence of the mortgage of $250,000 as a ground for rescinding the contract in question apply to this last-mentioned ground.

The Court below dissolved the injunction which had been granted in the case at the instance of the appellant and dismissed the appellant's bill without prejudice.   We approve of the decree of that Court and will affirm the same with costs to the appellee.

*Decree affirmed with costs to the appellee.*