# FARMERS' MILLING AND GRAIN COMPANY *v.* MILTON G. URNER ET AL.

*Gambling Transaction — What Constitutes — Speculation in Grain—Intent of Parties—Evidence—Mortgage Sale—Counsel Fee.*

There is no law against speculating, but if, at the inception of a contract for the sale of an article, the parties did not intend to deliver the article, but merely expected to settle in money the difference between the purchase and sale prices, the transaction is illegal as a wagering contract.          p. 47

In ascertaining the intention of the parties in this regard, if there is a conflict between them, the courts admit evidence of the surrounding facts or circumstances, in order that their real intention may be discovered.          p. 47

On an issue as to whether transactions involving the purchase and sale of grain through a broker by one of his customers were valid, since this depended on the intentions of the broker and the customer as to actual delivery, the intentions of the broker's correspondents elsewhere, to whom he transmitted the customer's orders, were immaterial, they not knowing anything about such customer or his transactions.          pp. 47, 48

In determining whether parties to transactions involving the sale and purchase of grain intended actual delivery of the grain, so as to render the transactions valid, the financial ability of the purchaser to pay for what he bought, the absence of any deliveries, the dealing on margin, the method of keeping accounts, were all relevant.          pp. 48-50

The controlling factor is the intention of the parties, and this intention, which is usually a question of fact, is not exclusively determined by an examination of the form of the transactions, but is arrived at by considering the form and all other facts and circumstances which have a legitimate bearing on the question.          p. 51

44      MILLING & GRAIN CO. *v.* URNER.

Findings of fact by the chancellor, where the testimony was taken in open court, will not be disturbed unless clearly erroneous.                                              p. 50

An attorney, who represented the purchasers at a mortgage sale in securing a reduction of the price on account of a shortage in the acreage, is not entitled to an appearance fee to be paid out of the proceeds of the sale.          p. 51

*Decided June 10th, 1926.*

Appeal from the Circuit Court for Frederick County, In Equity (WORTHINGTON, J.).

Proceeding by Milton G. Urner, Jr., to foreclose a mortgage given by Thomas A. Conaway, adjudged insolvent, for whom D. Princeton Buckey was elected permanent trustee. From an order refusing to distribute the surplus proceeds of the mortgage sale to the Farmers' Milling and Grain Company, said company appeals. Affirmed.

The cause was argued before BOND, C. J., URNER, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Leslie N. Coblentz* and *Alban M. Wood,* for the appellant.

*H. Kiefer DeLauter,* with whom were *Reno S. Harp* and *D. Princeton Buckey* on the brief, for Conaway's trustee. appellee.

WALSH, J., delivered the opinion of the Court.

The chief question to be determined in this case is whether or not certain agreements involving the buying and selling of grain for one Thomas A. Conaway by the appellant were wagering transactions. The record shows that Conaway in 1922 owned a farm near Mt. Airy in Frederick County, that the farm was worth about $7000, and had two mortgages on it totalling $4800, and that Conaway's sole other possessions consisted of about $1300 worth of personal property. In March, 1922, Conaway, apparently at the suggestion of Mr. Kline, president of the appellant company,

began to trade in grain "futures," and continued doing so until January 29th, 1925.   On October 23rd, 1924, he owed the appellant $1,441.11 for losses sustained by him in these transactions, and at the request of the appellant he gave a confessed judgment note for $2000, which note was applied to his then existing indebtedness, and the balance credited to his account and used as margin for subsequent transactions.   These transactions resulting in further losses, a judgment was entered on the note on November 12th, 1924, and when Conaway stopped dealing in grain in January, 1925, he owed the appellant $558.89 over and above the amount of that judgment.   On April 25th, 1925, Conaway's farm was sold under the first mortgage, and on the same day he was adjudicated an insolvent debtor in the Circuit Court for Frederick County, and D. Princeton Buckey and Reno S. Harp were appointed preliminary trustees, and later, on August 19th, 1925, Buckey was elected permanent trustee.

The actual amount paid for the farm by the purchaser at the mortgage sale was $7000, and after the payment of the costs and expenses, and the principal and interest due on the first and second mortgages, there remained in the hands of the assignee who made the sale the sum of $1539.60, which sum the appellant claimed as a payment on its judgment.   The auditor stated an account, in which this $1539.60 was distributed to the appellant, and Conaway's preliminary trustees in insolvency thereupon excepted to the ratification of the audit on the ground, *inter alia,* that the note on which the judgment was based was given for a debt growing out of a wagering transaction, and so was without consideration, and the judgment obtained on it invalid.   The learned court below, after a full hearing in open court, sustained this exception, and from this ruling and the order passed in pursuance of it, the appellant has appealed.

There has been a great deal of litigation in this country dealing with the question of what is and what is not a

gambling or wagering contract, and the respective rights of the parties to such contracts, and the decisions are not all harmonious. But here in Maryland the following principles have been established and must now be considered the settled law of the state.

In *Emerson v. Townsend,* 73 Md. 224, it was held, quoting from the headnote, that "under the Statute of 9 Anne, ch. 14, in force in Maryland, a note, a part of the consideration of which was for money loaned for gambling purposes, and the judgment recovered on such note, are both void, and execution will be enjoined."

In *Stewart v. Schall,* 65 Md. 289, 308, it was held, quoting with approval from *Irwin v. Williar,* 110 U. S. 499, that "where a broker is privy to a wagering contract, and brings the parties together for the very purpose of entering into an illegal agreement, he is *particeps criminis,* and cannot recover for services rendered or losses incurred by himself in forwarding the transaction." And in the same case the Court said: "In cases like this, it is competent to show that although in form the contract is perfectly legal, it is in fact a mere guise under which a gambling transaction may be conducted. The true nature of a fraud upon the law and public morals could not otherwise be exposed, and the evil of wagers under the guise of a legitimate enterprise be prevented."

In *Burt v. Myer,* 71 Md. 467, 504, the Court held that a prayer was proper which instructed the jury "that if they believed from the evidence in the cause that it was not the intention either of the plaintiff or defendants that there should be an actual delivery of the wheat purchased on account of the plaintiff, but that it was their mutual intention in such transactions that the difference between the cost of said wheat and the amount realized from the sale of the same should be settled by money, then the plaintiff (who was suing his brokers to recover money advanced to them for margins) is not entitled to recover."

These principles have also been applied and affirmed in *Billingslea v. Smith,* 77 Md. 504; *Cover v. Smith,* 82 Md. 586; *Dryden v. Zell,* 104 Md. 345; *Nes v. Union Trust Co.,* 104 Md. 15; *Richter v. Poe,* 109 Md. 20; and they are sustained by the great weight of authority throughout the country. See 19 *C. J.* 1088 to 1092, and 6 *R. C. L.* 780-783.

While the foregoing principles are well established, considerable difficulty is sometimes experienced in applying them. There is no law against speculating. A man can buy an article or commodity today and sell it tomorrow, or next year, without in any way violating the laws against gambling, nor does the fact that he gains or loses in the transaction render it illegal. Practically every commercial transaction involves the element of gain or loss, and the task of distinguishing wagering contracts from admittedly valid speculations is often not an easy one. The test seems to be that if, at the inception of the contract, the parties did not intend to deliver the articles dealt in but merely expected to settle in money the difference between the purchase and sale prices, the transaction is illegal. The application of this test requires the ascertainment of the intention of the parties, and where there is a conflict between them as to what their intentions were, the courts admit evidence of the surrounding facts and circumstances, so that the real intention of the parties can, if possible, be determined. 27 *C. J.* 1058 to 1060, and cases cited, *supra.*

In the present case Conaway testified that he never intended to accept delivery of the grain he purchased, but that his sole intention was to always sell it before the time of delivery and accept the profit or loss which resulted from such sales. On the other hand the two officers of the appellant with whom he dealt testified that all of Conaway's orders to buy grain were transmitted to a grain broker in Baltimore, and this broker testified that his firm purchased the grain through its representative in Chicago, and that the grain could have been delivered if called for. It is

conceded, however, that neither the Baltimore nor Chicago grain brokers knew Conaway in these transactions. They bought and sold for the appellant only, and hence, under the authorities, these brokers need not be considered at all in this case, and their intentions are immaterial. They could not have had any intention regarding Conaway's dealings in grain, because they did not know anything about him or his transactions. 27 *C. J.* 1092.

We are accordingly only concerned with the question of whether the appellant was, in the language of *Stewart v. Schall, supra,* "privy" to the wagering contract which Conaway undoubtedly intended to enter into, and to determine this we will have to briefly examine the "surrounding facts and circumstances" as they are disclosed by the evidence.

Conaway's farm was in the vicinity of the appellant's mill, he was a customer of the mill, and the appellant's officers knew him and knew something about his financial condition. Conaway's net worth at the time he began these transactions was $3,500, and, as we saw above, when he finished a little less than three years later he was insolvent. His first purchase in March, 1922, was of 5,000 bushels of wheat, and between that time and January, 1925, in more than fifty transactions he bought and sold more than half a million bushels of grain, worth about $620,000. None of this grain was ever delivered to him or to the appellant, he never actually paid for any of it, nor could he have paid for it. The smallest transaction he had involved the purchase of 5,000 bushels at a price in excess of $5,000, and on one occasion he bought 45,000 bushels at a cost of almost $50,000. The appellant's officers testified that when these transactions started Conaway had a balance of about $150 due him for grain of his own which he had sold the appellant, and thereafter they tried to have him keep sufficient balance to represent a five cent margin per bushel on what he bought. When his balance got below the necessary five cent margin, or became a debit, as it frequently did, he was called upon for more money, and finally when the debit became more than $1,400 in October, 1924, Conaway gave the appellant the

$2,000 confessed judgment note which is involved in this case. There is no evidence that the appellant was betting against Conaway in these transactions, the only apparent interest which it had in them being the commission of one-half cent per bushel which it received in each one, and which it in turn divided with the Baltimore broker. The record contains extracts from the appellant's books showing its transactions and accounts with Conaway, and an examination of these shows that each purchase and sale of grain was entered as a complete transaction, and the resulting gain or loss was then carried to Conaway's general account. For example, on a billhead of the appellant, marked "Sold to T. A. Conaway," we find, under date of March 15th, 1922, the following:

```
"Sold   5000 bushels May wheat   1.31 7/8 ...6593.75
        Commission. . . . . . . . . . . . . . .    25.00
        War Tax. . . . . . . . . . . . . . . .      1.32
  Bought 5000 bushels May wheat at
            1.30 . . . . . . . . . . . . . . . . .6500.00   6526.32
                                                  ─────────
            Net Gain. . . . . . . . . . . . . . . . .    67.43"
```

And a similar separate account of each purchase and sale of grain was made out by the appellant. In addition to these separate accounts, however, the appellant also kept a general account with Conaway, showing his credit or debit with it at any given time, but this general account does not charge Conaway with the full value of the grain he purchased, but simply credits or debits him with the gain or loss on each grain transaction, the entries, under the appropriate dates, being simply "Gain on May," "Loss on Dec.," and so on.

Under the foregoing facts and circumstances the learned court below concluded that it was the intention of the parties not to actually buy and sell grain, but to settle the differences between the purchase and sale prices in money, and that they were accordingly gambling transactions. It is difficult to escape reaching the same conclusion. The financial ability of the purchaser to pay for what he buys, the absence of any deliveries, the dealing on margin, the method of keeping the

accounts, etc., all have some bearing on the intention of the parties, and while none of these things standing alone would be conclusive, taken all together they are certainly very persuasive of the correctness of the finding of the lower court. It should also be remembered that this finding was one of fact, and it has long been established that where the testimony is taken in open court, as it was here, the fact findings of the chancellor will not be disturbed unless they are clearly erroneous. *Bortner v. Leib,* 146 Md. 546; *Klein v. Klein,* 146 Md. 33; *Gimbel v. Gimbel,* 148 Md. 182; *Coulston v. Baltimore City,* 109 Md. 275. No such contention can be successfully sustained in this case, and, without further prolonging this part of the opinion, we will simply affirm this finding of the court below on the ground that the evidence in the record does not justify our reversing it.

The appellant relied largely on the case of *Richter v. Poe,* 109 Md. 20, in which certain marginal transactions in stocks were held valid, but we do not see any conflict between the decision in that case and our finding in this one. The Court there applied the same test we are applying here, saying in the course of the opinion: "It is settled that 'where the contract is that in case of a decline in the market price of the stock, the purchaser is to pay the difference between the contract price and the market price, and there is no intention that he shall receive and pay for the stock itself, the dealing is a gambling contract, and the law does not permit an action to be maintained upon it.' Such a contract is null and void." It held, however, that the purchase of stock on margin was not necessarily a gambling contract, and that under the facts and circumstances in that case it was not established that the transactions there involved were wagering contracts. In the present case the facts and circumstances are quite different, and this difference has led us to a different conclusion as to the intention of the parties. There is no more conflict between the present case and the Richter case than there is between that case and the cases of *Stewart v. Schall, supra, Burt v. Myer,*

*supra,* and several other cases cited earlier in this opinion, in which cases the transactions were held to be wagering contracts. The controlling factor is the intention of the parties, and this intention, which is usually a question of fact, is not exclusively determined by an examination of the form of the transaction, but is arrived at by considering the form, and all other facts and circumstances which have a legitimate bearing on the question. And hence a decision that a certain transaction is or is not a wagering contract is not a precedent in subsequent cases unless the facts and circumstances are substantially the same, and, as we stated above, the facts and circumstances in the present case are quite different from those in the Richter case.

The only remaining question to be considered is that raised by the claim of the attorney for the purchasers at the mortgage sale to an appearance fee. Conaway's farm was advertised as containing so many acres of land, and was sold at so much per acre, the total amounting to $7144. It subsequently appeared that the farm contained three or four acres less than the number advertised, and, upon a petition being filed by the purchasers setting out this fact, the court abated the purchase price to $7000. The attorney who represented the purchasers in this matter claimed that he was entitled to an appearance fee to be paid out of the proceeds of the sale, and upon the auditor declining to make such an allowance he excepted to the audit. The lower court overruled this exception, and as no appeal was taken from its action in this regard the question is not before us. However, as some mention of it was made at the argument, and as the profession may have some interest in the question, we deem it proper to say that we concur with the conclusion of the learned chancellor on this point for the reasons set out in the opinion which he filed in the case.

Finding no error in the order appealed from, it will be affirmed.

*Order affirmed, the costs to be paid by the appellant.*