In re MALKO MILLING & LIGHTING CO.

District Court, D. Maryland. May 2, 1929.

No. 4445.

Guy W. Steele, of Westminster, Md., for trustee.

James E. Boylan, Jr., of Westminster, Md., for Shenandoah Milling Co.

Theo. F. Brown, of Westminster, Md., for Farmers' Milling & Grain Co.

WILLIAM C. COLEMAN, District Judge. This case arises on exceptions to the allowance by the referee of the claims of three separate creditors. The first claim is that of the state of Maryland for a franchise tax for the year 1925 in the amount of $80; the second claim is by the Shenandoah Milling Company for $1,764, on account of alleged failure on the part of the bankrupt company to deliver to it certain flour pursuant to contract; and the third claim is by the Farmers' Milling & Grain Company for $1,650.95 for alleged losses in connection with the purchase of wheat for the bankrupt company. These claims will be considered in the order in which they are referred to above.

First, with respect to the claim of the state of Maryland, the Malko Milling & Lighting Company went into the hands of receivers in the state court in November, 1924. In the latter part of January, 1925, a petition in bankruptcy was filed against it,

and adjudication followed in the same month. The trustee in bankruptcy was appointed in March. The tax here in question is imposed by virtue of article 23, § 109, of the Maryland Code. It is levied on the corporation in July, is payable the 1st day of September on the capital stock outstanding on the 1st day of the preceding January, "for its franchise to be a corporation." The trustee resists the payment of the franchise tax levied against the corporation in July, 1925, on the ground that the tax was not levied on property, but was in the nature of a license fee for the right to continue to exercise the privilege conferred upon it by the state, and that, since the receivership in November, 1924, there was in reality no corporate existence.

■ The court finds that the trustee's contention is unsound. Although it is true that the tax did not accrue until after the state receivership, this receivership did not in law terminate the corporate existence. The appointment of a receiver for an insolvent corporation does not work its dissolution under the law of Maryland, in the absence of a judicial declaration to that effect. Woodland v. Wise, 112 Md. 35, 37, 76 A. 502. The tax is laid on the right "to be a corporation"; that is, a tax upon the right conferred, not upon the actual exercise of it, regardless of what may be the reason for the nonexercise. It is true that the cases of New Jersey v. Anderson, 203 U. S. 483, 27 S. Ct. 137, 51 L. Ed. 284, and New York v. Jersawit, 263 U. S. 493, 44 S. Ct. 167, 68 L. Ed. 405, upon which the state of Maryland relies for the payment of the tax, rest upon facts different from those in the present case. In each of these cases the period which the tax covered had commenced to run, as it had in the present case, when the petition was filed; but, unlike the present case, there had been no prior receivership proceeding. However, this fact is not controlling. What is here said is believed to be entirely consistent with the decision in People v. Hopkins (C. C. A.) 18 F.(2d) 731. See, also, New York Trust Co. v. Island Oil & Transport Corp. (D. C.) 7 F.(2d) 416.

The case of United States v. Whitridge, 231 U. S. 144, 34 S. Ct. 24, 58 L. Ed. 159, upon which the trustee relies, is not apposite, because there the court was not concerned with a franchise tax, but with the Corporation Tax Law of 1909 (36 Stat. 112), which the court expressly held did not, by its terms, impose a tax upon corporate property *or franchises as such,* or upon corporate income,

unless the business was actually carried on by a corporation.

Next, as to the claim of the Shenandoah Milling Company. The facts are these: The Shenandoah Milling Company entered into two written contracts with the bankrupt for the purchase of flour, one on July 31, 1924, for 1,000 barrels, delivery to be made in "August, first half Sept., 1924." On August 7, 1924, a similar contract for an additional 1,000 barrels was entered into, delivery to be made the "last half of Sept., 1924." No deliveries were made, either in August or September, under either contract. On September 12th the Shenandoah Company wrote the bankrupt not to make any shipments until otherwise notified. However, in October and November 720 barrels were shipped and accepted by the Shenandoah Milling Company at the contract price named in the first contract; that is, $5.50 per barrel, which was 10 cents higher than the price per barrel specified in the second contract. In addition to these shipments, the Shenandoah Company ordered on November 25th—that is the day after receivers were appointed for the bankrupt—a further shipment of two carloads, which order the bankrupt declined the same day to fill, on the ground that it was in the hands of receivers.

The milling company's claim, as allowed by the referee, covers the undelivered balance—that is, 280 barrels under the first contract, and the 1,000 barrels under the second contract—and is based upon the difference between the contract prices and the market price of the flour at Shenandoah, Va., as of November 26, 1924, namely, the date when the bankrupt's notification to the Shenandoah Company that it was unable to fill its orders, due to the receivership, was received. The trustee objects to the allowance of any part of this claim, alleging that the bankrupt was at all times ready to make delivery, but was prevented from so doing by the action of the Shenandoah Company.

■ In a contract such as the present one, where deliveries are required within a certain time, but not in any specified installments, a proper construction to be placed upon such provision is that it is complied with if full delivery is made at any time within the time limit. On September 12th when the stop order was received, the time for performance under the second contract had not commenced, and three days were left before the time for September deliveries, if not for all deliveries, under the first contract, expired. To just what extent the bankrupt would

have been justified in confining all deliveries under the first contract to the period between September 12th and 15th, or whether it would in fact have been able to make full delivery then, we need not pass upon, because, while nothing is said in the contracts concerning an obligation on the part of the purchaser to notify the bankrupt when to ship, and in what amounts, such requirement may reasonably be implied from the form and subject-matter of the contracts, taken as a whole, and especially from the custom which is shown to have existed under previous similar contracts, to the effect that there was an understanding that the flour would be carried by the bankrupt until the Shenandoah Company notified it to ship. So the Shenandoah Company's notification of September 12th not to ship until otherwise notified was given before any breach by the bankrupt had occurred with respect to either contract.

■ There is a further question, however, still to be decided, and that is whether the delivery of 720 barrels by the bankrupt, after receipt of the stop order and their acceptance by the purchaser, has altered the situation and the rights which would otherwise inhere in the bankrupt. In other words, has there been a waiver by the bankrupt of its rights, or an election to go on with the contract? Where one party to a contract fails to perform a condition which justifies the other party in refusing to perform, and yet the other party does not expressly abandon or repudiate the contract, the latter has a choice of two courses—to go on with the contract, or to stop performance. If he chooses one, he loses his right to the other. The two are inconsistent, and he may not maintain both.

Election involves no requirement of mutual assent. It is the privilege of the injured party alone, namely, the bankrupt, in the present case. But, if the election has once taken place, the contract must be completed unless there has been an additional breach by the other party. In other words, if in the present case the bankrupt had voluntarily delivered any installments of flour under either contract in response to the Shenandoah Company's orders in October and November—that is, after the time within which the contracts required deliveries—the bankrupt could not have refused, without an additional breach by the Shenandoah Company, to fill orders for *all* the flour for which either contract provided. See Williston on Sales (2d Ed.) vol. 1, § 191a, and cases cited. Similarly, there appears to be no reason to lay down a different principle where shipments are made, as here, voluntarily, and accepted, although not in response to the buyer's order.

■ Lastly, we have the question whether, there having been an election, it can be said to relate to *both* contracts and thereby obligate the bankrupt to continue to fill the orders under both contracts. The 720 barrels were admittedly delivered under the first contract. No further proof of this is needed than the fact that they were paid for at the price designated in that contract, which is higher than the price designated in the second contract. This testimony is undisputed. Since no other barrels were delivered after the stop order, either on the bankrupt's initiative or in response to the Shenandoah Company's orders, there is no evidence which would warrant the court in deciding that there had been an election on the part of the bankrupt to continue more than the first contract.

Since it made an election to this extent, it was obligated, in the absence of an additional breach on the part of the Shenandoah Company, to complete deliveries within a reasonable period of time, which is a period equivalent to that provided for in the first contract. Therefore the only claim that should be allowed is one for damages, based upon the difference between the contract price for the 280 barrels, and the market price of an equivalent amount of flour at Hampstead, Md., as of November 26, 1924. In other words, the referee was in error in allowing any damages in relation to the second contract for 1,000 barrels, and also in error in using the market price on November 26, 1924, at Shenandoah, Va., because under the contracts the shipments were f. o. b. point of origin, namely, Hampstead. There is no evidence in the case as to whether the market price on the date named was different in the one place from that in the other. So the case will be remanded to the referee for the purpose of taking further testimony to establish this point.

■ Lastly, with respect to the claim of the Farmers' Milling & Grain Company, the court is satisfied that the referee was in error in allowing this claim, which covers primarily losses alleged to have been incurred in transactions in futures conducted for the bankrupt company. There is no proof that the bankrupt ever requested, either expressly or by implication, the claimant to do this trading on its behalf, or to pay any of the incidental items set forth in the claim. The board of directors of both companies were devoid of any knowledge of the indebtedness. The transactions extended over several years,

828

but no claim appears to have been made for any of the items in controversy until after the bankrupt went into receivership. Nor is there any proof that the bankrupt profited by what was done. It paid for all the wheat which it actually bought and received through the same broker with whom the trading in futures was conducted by claimant.

 The claim fails to recite the number of bushels traded in. In short, the only conclusion that can reasonably be drawn from the entire testimony is that Mr. Klein, who was president of both companies, which had been accustomed to borrow freely each from the other as occasion arose, began to speculate in the wheat market, and manipulated the accounts of the Farmers' Milling & Grain Company, so as to show an indebtedness on the part of the bankrupt when he found himself involved in losses due to this speculation. The claim is much too indefinite to be recognized in a court of bankruptcy. Only Mr. Klein and the bookkeeper for the Farmers' Milling & Grain Company appear to have known anything about Mr. Klein's transactions at the time. Clearly, what he did was an abuse of the positions which he held, and he was without authority to bind the bankrupt company. Even assuming that the bankrupt may have profited by what he did, this was no more than an indebtedness incurred by one party voluntarily for the benefit of another, which does not create a debtor-creditor relationship. See Huff **v.** Simmers, 114 Md. 548, 79 A. 1003.

For the above reason alone, the claim of the Farmers' Milling & Grain Company must be disallowed, and therefore it is unnecessary to consider whether the claim is void upon the authority of Farmers' Milling & Grain Co. v. Urner, 151 Md. 43, 134 A. 29, on the ground that it is based upon gambling transactions.

An order will be signed in accordance with this opinion.