JAMES A. LaFONTAINE *v.* HARRY W. WILSON,
TO USE OF FRED H. UGAST, ET AL.

[No. 68, October Term, 1945.]

674

*Decided February 7, 1946.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, GRASON, HENDERSON, and MARKELL, JJ.

*Wilson K. Barnes,* with whom were *Carman, Anderson & Barnes* and *Robert Peter* and *F. Barnard Welsh* on the brief, for the appellant.

*James W. Gill,* with whom were *Duckett, Gill & Anderson* and *Mason, Spaulding & McAtee* on the brief, for the appellees.

HENDERSON, J., delivered the opinion of the Court.

Harry W. Wilson brought an action at law in the Circuit Court for Prince George's County against James A. LaFontaine, Charles Price and the Maryland Athletic Club, to recover gambling losses. The declaration thus stated the alleged cause of action: "The plaintiff sues the defendants for that on divers days and dates, within three years last past before the filing of this suit, the plaintiff gambled at gaming tables operated by the defendants and lost thereby the sum of $43,886.00."

The Maryland Athletic Club was never summoned. Demurrers to the declaration interposed by the other defendants were overruled, and these defendants filed general issue pleas, and a suggestion of removal. The case was removed to Montgomery County and there tried before a jury. Towards the close of the case, a stipulation was entered into by counsel, wherein it was admitted that LaFontaine declined to answer an interrogatory as to whether he owned and operated the gambling establishment known as "Jimmy's Place" or the "Maryland Athletic Club," and it was conceded that this amounted to an admission that he did, by virtue of Rule 6 of the General Rules of Practice and Procedure of the Court of Appeals. The suit was then dismissed as to Price. After a demurrer prayer had been refused, the jury returned a verdict in favor of the plaintiff for $30,000, upon which judgment was entered after the trial court refused to disturb it on motion for judgment *n. o. v.* The judgment was later entered to the use of Ugast, Tyler and Groome, trading as the Capital Service Stations.

The evidence offered by the plaintiff (the defendant having offered none) may be thus summarized: Wilson testified that he worked as bookkeeper and cashier for the Capital Service Stations, and between May, 1942, and November, 1943, lost about $46,000 gambling at "Jimmy's Place" or the "Maryland Athletic Club," $44,000 of which he embezzled from his employers. He described in great detail the layout of the gambling estab-

lishment, and the methods of play. He generally played dice, occasionally roulette. Money was never used, but only chips purchased from the cashier, who redeemed chips at the close of play. Over objection a number of checks signed by the witness, and endorsed by one Joseph Bovello, and initialed "M. A. C.," were put in evidence.

Bovello was a doorman or assistant manager of the establishment and cashed the checks for the witness to enable him to buy chips. The checks were offered not to prove the amount of losses, but to corroborate the plaintiff's statement that he gambled in the establishment upon the dates when the checks were cashed.

Wilson testified, over objection, to a conversation with Bovello in September, 1943, in which Bovello suggested that he quit on account of his heavy losses, and said: "If you went up and talked to Mr. Jimmy, he would tell you the same thing." Subsequently the trial court struck out this testimony and told the jury to disregard it.

A witness, James A. Hughes, testified, over objection, that he represented Wilson, as attorney, in December, 1943, and negotiated for a settlement with counsel for LaFontaine. The latter handed him a paper on which he had written the names of James A. LaFontaine, Charles Price and Joseph Bovello, and told the witness that any settlement must be predicated upon a release by Wilson of those persons. This paper was offered in evidence, over objection, "for the purpose of establishing by the mouth of their attorney the people who operate this place and for no other purpose." The paper and all of Hughes' testimony was subsequently stricken out by the trial court, and the jury was instructed to disregard it.

Wilson testified in detail as to the methods he used to keep the books of the Capital Service Stations in apparent balance, by manipulating checks and the cash account. Fred H. Ugast, one of the owners of Capital Service Stations, testified as to Wilson's employment, his duties, and access to the safe. Samuel R. Huey, a public accountant, testified to his discovery of the short-

age, Wilson's confession, and his audit establishing the loss to be $44,024, which Wilson verified.

The declaration was based upon Section 298 of Article 27 of the Maryland Code (1939 Ed.), which reads: "Any person who may lose money at a gaming table may recover back the same as if it were a common debt, and shall be a competent witness to prove the sum he lost; but no person shall recover any money or other thing which he may have won by betting at any game or by betting in any manner whatsoever." Section 299 of Article 27 provides that "all games, devices and contrivances at which money or any other thing shall be bet or wagered shall be deemed a gaming table within the meaning of Sections 288, 289, 290, 296, 297 and 298."

The appellant contends that the declaration was insufficient, and the proof was likewise insufficient to comply with the early English Statutes entitled "An Act against deceitful, disorderly and excessive gaming," 16 Charles 2, Ch. 7 (1664), and "An Act for the better preventing of excessive and deceitful gaming," 9 Anne, Ch. 14 (1710). It is contended that these Acts are still in force in Maryland, and that the procedural limitations set forth in these Statutes must be read into the Maryland Statute upon which the plaintiff relies. In England the first of these was repealed by 8 and 9 Vict., Ch. 109 (1845) and the second modified by 55 and 56 Vict., Ch. 9 (1892) so as to prevent recovery by a loser after payment. For discussion of these and subsequent English Statutes, see *Williston, Contracts,* Rev. Ed., Sec. 1679, and *Pollock, Contracts,* 11th Ed., p. 297 *et seq.*

Wagers were legal at common law (*Williston, Contracts,* Rev. Ed., Sec. 1667), but by the Statutes of Charles and Anne certain forms of wagering were made illegal, and recovery by a winner was denied. 2 *Alexander's British Statutes,* 2d Ed., p. 648. The Statute of Charles provided that the loser "by any Fraud, Shift, Cousenage, Circumvention, Deceit, or unlawful Device, or ill Practice whatsoever," might recover treble damages, one moiety thereof for the Crown, by suit within

6 months "next after such play," or suit might be brought by any other person within one year after the six months expired. Another provision denied recovery to any winner in excess of one hundred pounds. The Statute of Anne provided in Section 1 that all notes or other securities given for money lost by gaming, or for repaying money knowingly loaned or advanced for gaming or betting, should be void. Section 2 provided that any person "who shall, at any time or sitting, by playing at Cards, Dice, Tables or other Game or Games whatsoever, or by betting on the Sides or Hands of such as do play," lose "in the whole, the Sum or Value of ten Pounds, and shall pay or deliver the same," shall be "at Liberty, within three months then next, to sue for and recover the Money or Goods so lost * * * from the respective Winner or Winners thereof, with Costs of Suit, by Action of Debt Founded on this Act." If the loser did not sue, any other person could sue for treble damages, one moiety for the suitor, and one moiety for the poor of the parish. Section 3 provided for discovery; Section 4, that repayment should acquit of further punishment; Section 5, that winning by fraud above ten pounds should be punished as perjury, with recovery of five times the amount won; and Section 8 provided penalties and imprisonment for assault on account of money won at play.

There is no doubt that these Statutes were adopted in Maryland, at least in part. *Kilty, Report of British Statutes* [1810], p. 248. In *Hook v. Boteter,* 1793, 3 H. & McH. (1793) 348, a loser recovered 120 pounds lost at gaming (not deceitful or unfair) at one sitting, which he had paid by orders for goods. The declaration was expressly based on the Statute of Anne. In *Gough v. Pratt,* 1856, 9 Md. 526, an assignee of a single bill given for money lost at play recovered a judgment and issued execution. The judgment debtor filed a bill for an injunction, and the relief was granted. It was contended that Section 1 of the Statute of Anne had been repealed by Chapter 84 of the Acts of 1813, which provided that no recovery should be had for money lost or won in

gaming; but the Court held that there was no inconsistency between the first section of the Statute of Anne, denying recovery of a note or other security given for money lost by gaming, and the Act of 1813 denying recovery to any winner. The Court did not pass on the question whether Section 2 of the Statute of Anne, governing the rights of a loser, was repealed by the Act of 1813. In Emerson v. Townsend, 73 Md. 224, 20 A. 984, collection of a judgment obtained upon a note given for money loaned for the purpose of gambling was enjoined upon the authority of Section 1 of the Statute of Anne. See also *Spies v. Rosenstock*, 87 Md. 14, 39 A. 268. These cases did not involve the rights of a loser to recover. In *Farmers Milling and Grain Co. v. Urner*, 151 Md. 43, 46, 134 A. 29, the question turned upon whether certain transactions for the purchase and sale of grain were in fact wagering contracts, under the first section of the Statute of Anne.

Several other Acts were passed, subsequent to the Act of 1813, on the subject of gaming. Chapter 88 of the Acts of 1826, provided heavy fines and imprisonment for the keeping of gaming tables. Chapter 180 of the Acts of 1842 was passed as a supplement to the Act of 1826, and provided for the recovery of fines, as debts, or by indictment, for keeping gaming tables. Section 10 of Chapter 180 of the Acts of 1842 expressly repealed "all Acts of Assembly heretofore passed, for the purpose of suppressing gaming."

This was the state of the law when the Legislature in 1853 appointed codifiers to revise and codify the statutory law of the State; pursuant to the direction in the Constitution of 1851, Art. III, Sec. 17. On the basis of their report, the Code of 1860 was adopted "in lieu of and as a substitute for all the public general laws * * * heretofore passed by the Legislature of Maryland." See *Brenner v. Plitt*, 182 Md. 348, 361, 34 A. 2d 853. Section 61 of Article 30 of the Code of 1860, title "Crimes and Punishments," subtitle "Gaming," contained the identical provisions which now appear in Section 298 of Article

27 of the present Code. The second clause is obviously based upon the Act of 1813; the first clause restores a right of recovery by a loser, which was abrogated by the Act of 1813.

We see no force in the contention that the right was restored subject to the conditions and limitations set out in the second section of the Statute of Anne. The present statute is complete in itself; to the extent that it is inconsistent with and repugnant to the earlier statutes, it must be taken to modify or repeal them. While it is a general rule that repeal by implication is not favored, there is a well established exception where the Legislature undertakes to deal with the whole subject matter.

In *Montel v. Consol. Coal Co.*, 39 Md. 164, 170, it was said: "This law belongs to a class of legislation not unfrequent in modern times, where it becomes necessary to revise and amend all existing laws upon some important matter, and establish in lieu thereof, a new and general law or Code, embracing a complete scheme of legislation on that particular subject (corporations). The Act of 1868, is emphatically a law of this character," and at page 173 of 39 Md.: "If every omitted provision of existing laws on these same subjects, were held to be still in force * * * [it] would render the work of revision a work of confusion and make it almost worse than useless. In such case it is far better and safer for the Courts to determine the new law to be a substitute for everything contained in the old." See also *State v. Coblentz*, 167 Md. 523, 175 A. 340, and cases there cited. We think the case of *Barber v. State*, 50 Md. 161, relied upon by the appellant, is readily distinguishable. It was there held that the English Statute 1 Jac. I, Ch. 11, was still in force in Maryland, modified by the Act of 1809, Ch. 138, as to the punishment for the offense of bigamy, but not as to the grade of the crime. It was pointed out that it was not the object of the Act of 1809 to prescribe offenses and define the elements of crime, merely to estab-

lish a "justly proportioned scale of punishments" for existing crimes.

In the case at bar, we think that the second section of the Statute of Anne, if not repealed by Chapter 84 of the Act of 1813, which forbade any recovery by a loser, was either modified or partially duplicated by the Code of 1860. In any event we hold that liability under Section 298 of Article 27 of the present Code is in no way limited or restricted by the provisions of the second section of the Statute of Anne. It follows that it was unnecessary to allege or prove that the loss occurred within three months of the time of suit or at one time or sitting. For the same reason, it was unnecessary to declare specially upon the Statute.

The appellant contends, however, that there is no proof that the appellee "lost" money, within the meaning of the statute. The objection is two-fold: (1) that there is no legally sufficient evidence to show that the money was lost to LaFontaine, and (2) that the undisputed evidence shows that almost all the money lost belonged to the partners in Capital Service Stations, and not to the appellee.

We have no difficulty with the first point. The testimony shows that Wilson gambled only against the "house," that is to say, the agents of the operator and owner, who was admitted to be LaFontaine. In *Jones v. Mechanics Bank,* 1849, 8 Gill 123, the Court said: "No connection or association in the faro bank, or its profits, was shown to have existed between Perry, Campbell and James, the two latter being the keepers of the table." The action was against Perry, for money had and received. There was no evidence that Jones and Perry played against each other, but only that they "played conjointly against the faro bank." The Court expressed no opinion as to whether the loser could recover, in any event, in an action for money had and received. In *Corner v. Pendleton,* 8 Md. 337, there was an action for money had and received by employers against the proprietor of a. gaming-table, for money allegedly lost by

their clerk, but there was no legally sufficient proof that the clerk took their money or that he lost it to Pendleton. The clerk did not testify, nor was there any identification of the money lost with the funds collected. The authorities generally recognize the right of the owner of funds embezzled or stolen, and gambled by an employee, to recover from the winner in an action for money, had and received, or in equity, provided the funds are traceable. See Note 2 A. L. R. 345. In the case at bar, there was direct testimony that all of the money embezzled was lost at play against "keepers" of the gambling table, and the action was based entirely upon the statute.

The second point raises the question whether recovery under the statute can be had by the loser of money belonging to other persons. The question is novel in this State, but there are decisions in other states bearing upon the point.

In *Ruckman v. Pitcher*, 1859, 20 N. Y. 9, it was held (two Judges dissenting) that a loser who had placed a bet on a horse race for himself and two others could not recover for such others, but could only recover his share of the bet. The earlier case of *Haywood v. Sheldon*, 1816, 13 Johns, N. Y., 88, to the contrary, was not cited. In *Bamman v. Erickson*, 1942, 288 N. Y. 133, 41 N. E. 2d 920, the decision turned upon whether the loser was merely a casual gambler; it does not appear whether recovery included money belonging to others. The cases of *Mead v. McGraw*, 19 Ohio St. 55; *Wood v. Owens*, 32 Tenn. 146; *Donahoe v. McDonald*, 92 Ky. 123, 17 S. W. 195, and *Ware v. Dumont*, 123 Ill. App. 1, were all cases where the loser was an agent, and not allowed to recover for his principals in the joint venture. Underlying these decisions is the concept of wrongful participation in an illegal act, which would prevent the agent from being held accountable. Compare *Saffery v. Mayer* [1910], 1 K. B. 11; *Maskell v. Hill* [1921], 3 K. B. 157; *Cafferata v. Ginnochio* [1920], Mo. App., 222 S. W. 867; *Kyne v. Kyne* [1940], 16 Cal. 2d 436, 106 P. 2d 620.

On the other hand, where the money bet by the loser, not his own, was embezzled, the cases all seem to permit recovery. *Harris v. Brooks,* 56 Ala. 388; *Zellers v. White,* 208 Ill. 518, 70 N. E. 669; *Crowley v. Taylor,* 49 Wash. 511, 95 P. 1016; and *Raymond v. Green,* 194 Mich. 639, 161 N. W. 857. In *Grant v. Owens,* 55 Ark. 49, 17 S. W. 338, it was held that the employer could not recover under the statute, but only the person who lost the wager. These decisions seem to rest upon the theory that there is a duty of restitution upon the loser, either as bailee or constructive trustee, and the statutory action is for the benefit of the true owner. Compare *Restatement, Restitution,* Sec. 202 (L), and see *Harker v. Dement,* 9 Gill 7, 52 Am. Dec. 670. To allow the winner in a gaming transaction to defeat an action by a loser on the ground that the loser had embezzled or stolen the goods, would obviously introduce a collateral issue, and limit the effectiveness of the statute to prevent gambling. We think the Maryland Statute authorizes recovery by the person placing a wager with money embezzled, regardless of title to the funds lost. The fact that there may be another form of action available to the true owner is immaterial.

The appellant contends that the plaintiff failed to prove, by legally sufficient evidence, the amounts and dates of alleged losses and winnings. We find no merit in this contention. There was evidence from which the jury could find that he lost at play in "Jimmy's Place," over and above his winnings, all of the money he embezzled. Nor do we find any error in permitting the plaintiff to testify as to his average bets, the method of play and the number of times he visited the establishment. These objections went to the weight of the evidence, not to its admissibility.

The appellant complains that the trial court admitted certain checks in evidence, and a paper offered by the witness, Hughes, which were later stricken out. He made no motion for a continuance or mistrial, in this connection, and we think the court's instruction to the jury

was sufficient to cure any errors in admitting these papers originally. *State, for Use of Thompson v. Emerson & Morgan Coal Co.*, 150 Md. 429, 443, 133 A. 601. The same thing is true of the plaintiff's alleged conversations with Bovello, and Hughes' conversations with the attorney for the appellant. Insofar as these statements tended to connect the appellant with the establishment, their effect was neutralized by the subsequent admission drawn from the appellant, as to his ownership and operation of the establishment.

We think the evidence, was legally sufficient to take the case to the jury, and find no reversible error in the rulings of the trial court.

*Judgment affirmed, with costs.*